Filed 10/26/15  P. v. Gonzalez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B249598 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA070627) |
| v. | |
| HORACIO GONZALEZ et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dalila C. Lyons, Judge.  Affirmed as modified.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant Horacio Gonzalez.

Matthew D. Alger, under appointment by the Court of Appeal, for Defendant and Appellant Cristian A. Adame.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Samantha Rodriguez.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Myra Rangel.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Zee Rodriguez, Louis W. Karlin, and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendants Horacio Gonzalez, Cristian A. Adame, Samantha Rodriguez, and Myra Rangel guilty of conspiracy to commit murder, attempted premeditated murder, and shooting at an occupied vehicle in connection with an incident that occurred on March 15 and 16, 2010. It further found defendants Gonzalez and Adame guilty of one count of murder, five additional counts of attempted premeditated murder, five counts of assault with an automatic firearm, and one count of street terrorism arising from a separate incident that occurred on March 23, 2010. The jury also found Gonzalez guilty of one additional count of attempted premeditated murder in connection with a third shooting incident that occurred on March 24, 2010. The jury found true all of the special allegations against all four defendants, including the allegation that the charged crimes were committed for the benefit of a criminal street gang. All four defendants received lengthy sentences, ranging from Rangel's and Rodriguez's 75-years to-life to Adame's 480-years to-life. All four of them have timely appealed on a host of different grounds. We direct the trial court to correct the abstracts of judgment for Adame and Rodriguez and to stay the enhancements imposed on counts 2 and 3. We affirm the judgment in all other respects.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    Procedural History**

The Los Angeles County District Attorney ("the People") filed a 17-count amended information against defendants Gonzalez, Adame, Rodriguez, and Rangel. Counts 1-4 named all four defendants and concerned an alleged shooting incident that took place on or between March 15 and 16, 2010. In count 1, the People alleged that all four defendants conspired to commit murder (Pen. Code, §§ 182, subd. (a)(1) & 187, subd. (a)).[1] In counts 2 and 4, the People charged all four defendants with attempted premeditated murder (§§ 187, subd. (a) & 664). In count 3, the People charged all four defendants with shooting at an occupied vehicle (§ 246). The People further alleged,

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

with respect to all four defendants on all four of these counts, that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)), and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)). Gonzalez and Adame were the alleged principals; the information alleged they each personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). The information further alleged the personal use and discharge of a firearm allegations against Gonzalez and Adame "also caus[ed] the above offense[s, counts 1-4,] to become a serious felony pursuant to Penal Code section 1192.7(c)(8) and a violent felony within the meaning of Penal Code section 667.5(c)(8)."

Counts 5-15 pertained to a separate incident that occurred on or about March 23, 2010 and named only Gonzalez and Adame. In count 5, the People charged Gonzalez and Adame with murder (§ 187, subd. (a)) and alleged that the offense was a violent and serious crime (§§ 667.5, subd. (c), 1192.7, subd. (c)) to which section 186.22, subdivision (b)(5) applied. In counts 6-10, the People charged Gonzalez and Adame with attempted premeditated murder (§§ 187, subd. (a) & 664). The People further alleged that Gonzalez and Adame each personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) in connection with counts 5-10, rendering those counts serious felonies within the meaning of section 1192.7, subdivision (c)(8) and violent felonies within the meaning of section 667.5, subdivision (c)(8). In counts 11-15, the People charged Gonzalez and Adame with assault with a semiautomatic firearm (§ 245, subd. (b)), a serious offense within the meaning of section 1192.7, subdivision (c), alleged that Gonzalez and Adame each personally used a firearm (§ 12022.5) and further alleged as to counts 11, 12, 14,

and 15[2] that Gonzalez and Adame personally inflicted great bodily injury on the victims (§ 12022.7, subd. (a)), causing the offenses to become serious felonies within the meaning of section 1192.7, subdivision (c)(8).  In count 17, the People charged Gonzalez and Adame with street terrorism (§ 186.22, subd. (a)) in connection with their charged March 2010 activities.

Count 16 named only Gonzalez.  In that count, the People charged Gonzalez with attempted premeditated murder (§§ 187, subd. (a) & 664) in connection with a shooting incident that occurred on or about March 24, 2010.  The People further alleged in connection with count 16 that Gonzalez or a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)), and personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d) & (e)(1)).

The People alleged that counts 1-16 were committed for the benefit of or in association with a criminal street gang (§ 186.22, subds. (b)(1)(C) & (b)(4)).  They also alleged that Adame had suffered one prior serious or violent felony conviction (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d)).

All four defendants were jointly tried by a single jury.  The jury found all four defendants guilty as charged and found true all of the special allegations included on the verdict forms.  After a subsequent bench trial, the court found true the prior strike allegation against Adame.

Gonzalez was sentenced to a total term of 380 years to life on the indeterminate counts, with an additional 100 years on the determinate counts imposed and stayed pursuant to section 654.  Adame, whose prior strike rendered him subject to a doubling of parole-eligibility periods, was sentenced to a total of 480 years to life in prison for counts 1, 4, 5, 6, 7, 8, 9, and 10.  Additional terms were imposed and stayed for the remaining counts and sentence enhancement findings.  Rodriguez and Rangel each were sentenced

_____

[2] The victim named in count 15 was not injured, and the verdict forms did not include this allegation for count 15.

4

to a total of 75 years to life on counts 1 and 4, with additional terms imposed and stayed for counts 2 and 3.

All four defendants timely appealed.

## II. The People's Evidence

### A. Background

Defendant Gonzalez, known as "Casper," belonged to the Pacoima Flats gang. He was a friend of defendant Adame, nicknamed "Fresh" and "Smooth," who belonged to another gang, the Pacoima Project Boys. Both the Flats and the Project Boys were rivals of a third Pacoima-based gang, the Pacoima Knock Knock Boys. The Knock Knock Boys expressed their contempt for Project Boys and Flats members by calling them "rejects," a derogatory term aimed at the origins of these gangs in the San Fernando Gardens housing projects.

Defendants Rangel, known as "Trippy," and Rodriguez, known as "Danny Girl" or "D Girl", associated or "kicked it" with members of the Project Boys and Flats. Members of the Project Boys and Flats occasionally "hung out" at Rangel's apartment.

Rangel's roommate, Danny Perez,[3] was a methamphetamine addict who knew members of various gangs and liked to "party," i.e., get high, with them indiscriminately. Perez was friendly with Sergio Abrego, a member of the Knock Knock Boys. Abrego's phone number was programmed into Perez's cell phone under Abrego's gang moniker, "Scrappy." Abrego did not like Rangel due to her association with the Project Boys and Flats and accordingly referred to her using the derogatory slang "reject bitch."

Perez telephonically introduced Abrego to fellow methamphetamine user Alexis Garcia, a long-time friend of Perez and Rangel, a week or two before March 15, 2010.

---

[3] Perez identified as male and went by the name "Danny" in 2010. At the time of trial nearly three years later, Perez identified as female, preferred to be known as "Jazleen," and asked the court to refer to her as "Ms. Perez." For the sake of clarity and consistency, and not out of disrespect, we refer to Perez using the male pronouns he and others used at the time of the incidents.

5

Garcia, who went by the moniker "Whisper," had spoken to Abrego on the phone once as a result of Perez's introduction, but had not met him in person.

### B.    The March 15-16 Incident (Counts 1-4)

Garcia stayed at Rangel's and Perez's apartment for a few days in March 2010. She left sometime on March 15, 2010 to go "party" with another friend of hers. Rangel and Perez remained at the apartment.

Perez was coming off a methamphetamine binge that had kept him awake for three days. He fell asleep in his bedroom sometime after nightfall. Perez's cell phone was plugged into an outlet in his bedroom. Perez's bedroom door did not lock, and he and Rangel had permission to enter one another's rooms. Perez also allowed Rangel to borrow his cell phone when Rangel needed to use it.

Sometime after Perez fell asleep, Abrego called Perez's cell phone. Instead of speaking with the sleeping Perez, Abrego spoke with a female who identified herself as "Whisper." Abrego and the speaker posing as "Whisper" arranged to meet and "party." Abrego agreed to pick up "Whisper" near the intersection of Canterbury Avenue and Woodman Street in Pacoima. "Whisper" was supposed to be on foot. Abrego and his friend, Miguel Castro, drove to the designated meeting spot in Castro's Astrovan.

Meanwhile, Garcia returned to Rangel's apartment complex sometime between 11:00 p.m. and 12:00 a.m. Garcia testified under a grant of immunity that she encountered Rangel, Gonzalez, Adame, and Rodriguez exiting the complex's gate as she was walking back to Rangel's apartment. Garcia did not know Rodriguez, whom the others were calling "Danny Girl," but recognized Casper (Gonzalez) and Fresh (Adame). Garcia saw and heard Rodriguez using a cell phone and saying things like, "Are you coming?" Garcia testified that her perceptions of the night's events were not clouded by her recent "partying" because she could "control" the effects methamphetamine had on her.

Rangel told Garcia that Perez was asleep in the apartment and the door was locked, so Garcia should leave with them. Garcia joined the group and got into the backseat of a dark-colored, four-door car with Rangel. Rodriguez got into the front

6

passenger seat. Another member of the Pacoima Flats gang, Ernesto Aguayo, known as "Sparky," was in the driver's seat. Garcia saw Gonzalez and Adame get into a white car with a sunroof. She recognized the car as Adame's. Adame drove and Gonzalez sat in the front passenger seat.

Aguayo drove the dark-colored car to the area of Canterbury Avenue and Filmore Street.[4] During the short drive, Garcia saw Rangel give a cell phone to Rodriguez. Rangel directed Rodriguez to make phone calls. Garcia heard Rodriguez saying things like, "if they are coming" and "they were on their way." There was only one cell phone in the car, and cell phone records introduced at trial documented numerous phone calls between Perez's and Abrego's phones on March 15 and 16. Abrego also testified that he and "Whisper" were "calling each other back and forth."

Rangel told Garcia and Rodriguez to get out of the car near the intersection of Canterbury and Judd Street, which Garcia testified was about 37 feet away from Canterbury and Filmore. Aguayo and Rangel drove away once Garcia and Rodriguez exited the car. Rodriguez still had the cell phone; Garcia heard her asking, "Are you here yet?" Rodriguez also made a call and asked if "they were there." Garcia saw a van with two people in it drive by on Canterbury and heard Rodriguez say, "That's them."

About ten minutes after Abrego and Castro set out in Castro's van to meet "Whisper," they arrived in the vicinity of Canterbury and Woodman. They did not see any girls waiting. Abrego and "Whisper" spoke on the phone and "Whisper" proposed several changes to their rendezvous point. Abrego became concerned that he was being set up and told Castro to leave the area. When the van was near the intersection of Canterbury and Filmore, Abrego and Garcia saw a white car – Adame's car – drive past on Filmore. As the white car drove by the van, Garcia heard shots and saw "the flashing of the gun going off" from the driver's window and sunroof of the white car.

---

[4] Filmore Street turns into Lassen Street near Canterbury Avenue. Some of the testimony at trial referred to the intersection as "Canterbury and Lassen." We refer to the intersection as "Canterbury and Filmore."

Abrego, who did not have a gun with him, ducked down when the shooting started. He heard about nine or ten shots. Castro steered the van down Filmore and the white car drove away.

Shortly after the shooting ended, the dark-colored car driven by Aguayo returned to the corner of Canterbury and Judd to pick up Garcia and Rodriguez. When Garcia and Rodriguez got into the car, Rangel laughed and "kept asking if they got him." Rangel also informed Garcia that Rodriguez had been talking to Scrappy from the Knock Knock Boys on the cell phone.

Aguayo drove to a nearby Jack in the Box restaurant. Garcia saw Adame's car there as well, and surveillance footage showed both cars at the restaurant. After the cars left the restaurant but before they arrived at the house that was their next destination, someone in Aguayo's car made another phone call to Abrego.

When the two cars arrived at the house, Garcia saw Adame and Gonzalez emerge, respectively, from the driver's and front passenger seats of the white car. The occupants of both cars went inside the house, and Gonzalez and Adame told someone there about the shooting. Gonzalez talked about how he had shot from the sunroof, and Adame talked about the shooting generally. They mentioned that they had shot out the windshield and windows of the van but did not know if they "got" Abrego.

Abrego, whom the court found to be a "hostile" and "deliberately evasive" witness, testified that he realized after the shooting ended that he had been hit in both of his legs. Castro, who had not been hit, attempted to drive Abrego to a hospital but could not do so because his van had sustained 15 bullet impacts, a shattered windshield, numerous shot-out windows, and a flat tire in the shooting; Abrego testified it "wouldn't drive no more." Castro called his friend Humberto Rodarte for a ride. Rodarte picked up Castro and Abrego and drove to Holy Cross Hospital, where he dropped off Abrego.

Los Angeles police officer Stephen Koyle was dispatched to the hospital to speak with Abrego. Abrego was reluctant to talk about the incident but told Koyle he had been shot near Canterbury and Filmore. Officers who subsequently responded to that intersection discovered skid marks, broken glass, 18 shell casings, and one "slug," or

8

projectile bullet. Fifteen of the casings were from a .45 caliber gun, and three were from a .40 caliber gun. A firearms analyst testified that the casings had to have come from two different guns.

After speaking to Castro and Rodarte on the morning of March 16, 2010, police detectives located an Astrovan parked in the driveway of a home on Kewen Street, where Rodarte's aunt lived. The van, which was registered to Castro, had a blown-out tire, shattered windows, and bullet impact marks all along the driver's side. A criminalist who specialized in firearms analysis examined the van and concluded that all but one of the bullet impacts on the vehicle came from the outside. She could not tell where that one bullet originated because the window it traveled through was completely blown out.

Police detective Eric Reade interviewed Abrego after Abrego was released from the hospital. Reade testified that Abrego initially was evasive and uncooperative during that interview. Eventually Abrego told Reade that he had spoken to "Whisper" and her friend "Clumsy"[5] on the phone, that he had told them he belonged to the Knock Knock Boys, and that he planned to meet them in the area of Woodman and Lassen. Abrego told Reade that Hispanic males in a white car opened fire on the van he and his friend Castro were in, and that they had to call Rodarte to pick them up. Abrego further told Reade that Rodarte dropped him at Holy Cross Hospital, where he received additional phone calls from "Whisper." During one of those phone calls, about 15 or 16 minutes after the shooting, "Whisper" told Abrego something to the effect of, "That's why we shot you, you punk motherfucker." Abrego told Reade – and, like Perez, also directly testified – that he called Perez a few days after the shooting to find out what had happened and to see if Perez had set him up. According to Reade, Perez told Abrego that "Whisper and Clumsy had used his cell phone to call Mr. Abrego that evening." (Defendants' hearsay objections to this testimony were overruled.)

---

[5] Detective Reade was the only witness who used the name "Clumsy." There is a general consensus among the parties' briefs that "Clumsy" is the same person as "Trippy," i.e., Myra Rangel.

9

Perez told detectives that he learned from Whisper (Garcia) that Rangel and another girl were "kicking it" in the apartment with some guys from Pacoima while he slept on March 15-16. Perez also heard from Whisper that guys named Fresh and Sparks or Sparky were involved. Whisper further told Perez that his phone had been used to set up Abrego; this upset Perez because he had known Abrego for a long time and cared for him. Perez also told detectives that Rangel laughed and said something to the effect of, "that fool's stupid" when he confronted her about setting up Abrego. Rangel's reaction made Perez "mad." Rangel also made Garcia mad when she laughingly told Garcia that Garcia had done them a "favor" because they used her name, "Whisper," to lure Scrappy (Abrego) to Canterbury and Filmore.

Rangel's cousin Erick Davalos, whom she referred to as her little brother, testified at trial that he "kicked it" with the Project Boys and was present at Rangel's apartment on March 15-16. Davalos testified under a grant of immunity that he recalled being at the apartment with Rangel, Adame, Gonzalez, and Rodriguez and seeing Gonzalez use Perez's cell phone. Garcia was not there. Rangel, Adame, Gonzalez, and Rodriguez left the apartment without Davalos. Rangel told Davalos they were going to get food at Jack in the Box.

Estepanie Cortez, Gonzalez's then-girlfriend, was not present on March 15 or 16 (or on March 23 or 24). She testified under a grant of immunity that Gonzalez confided in her after his arrest on April 1, 2010. He told her that he and Fresh (Adame) drove Fresh's white car to Filmore and "some other little street" and shot at some guys in another car. Gonzalez further told her that one of the guys they shot at was named Scrappy, and that he had "used" and "forced" Trippy, D Girl, and Whisper to get in contact with Scrappy to set him up. In a recorded jailhouse conversation with Cortez that was played for the jury, Gonzalez referred to a female witness and said, "she's not even going to be alive so hopefully she doesn't go to court for me, man, so – that's all they got on me. As long as she doesn't show up, I'm cool." Cortez testified that Gonzalez's statement referred to Whisper (Garcia), whose house was shot at after she testified at a preliminary hearing in the case.

10

Gonzalez also asked Cortez to save a letter Rangel wrote to him. In that letter, which Cortez read to the jury, Rangel apologized "for everything [she] did and said" to the police about the incident. Rangel also indicated that she was "going to deny everything and not blame anything on" Gonzalez. Gonzalez characterized the letter as "snitching."

## C. The March 23 Incident (Counts 5-15)

Davalos testified that he was hanging out with Gonzalez and Adame on March 23, 2010. Around 5:00 p.m., the trio went to Gonzalez's house on Filmore Street in Pacoima and hung out in the backyard. Gonzalez was wearing black. At some point after dark, about four to six hours after they began hanging out in the backyard, Gonzalez said, "Let's go." Gonzalez and Adame then left Davalos alone in the yard for about 20 minutes. While they were gone, Davalos heard something that sounded like shooting. On cross-examination but not on direct or at the preliminary hearing, Davalos testified that Gonzalez and Adame had firearms in their hands when they left.[6] According to Davalos, Adame had a handgun and Gonzalez had an "AK," "some type of automatic weapon."

Gonzalez and Adame returned to the yard less than ten minutes after Davalos heard the shooting noises. Davalos testified that when Gonzalez and Adame reentered the yard, Gonzalez was holding two guns and Adame was holding his arm as if it were injured. Davalos described one of the guns as a handgun and said that the other looked like an assault rifle. Gonzalez stowed both guns between the yard's wooden fence and a board that was leaning against it. Gonzalez and Adame then began trying to figure out how to get to a hospital.

Gonzalez eventually made a phone call and a woman named "Crazy" arrived at the house, picked up Gonzalez, Adame, and Davalos, and drove them to Brotman Hospital. During the approximately 30-minute drive to the hospital, which was more

[6] Davalos also admitted on cross-examination that he had added details to his story each time he met with police, including during a meeting the week before he took the stand at trial, and that he had lied during the preliminary hearing.

11

than 25 miles away, Adame, who continued to hold his arm, said that he and Gonzalez had opened fire on a group of "Black people" on Pinney Street "because them niggas owed." According to Davalos, Adame said that he and Gonzalez walked away from the group, turned around, and then started "bucking on," or shooting at, them. Davalos testified that Adame also said that he was injured when people in the group shot back.

Los Angeles police officer Nicholas Torres testified that he was dispatched to Brotman Hospital to speak to a shooting victim at approximately 11:50 p.m. on March 23, 2010. He identified that victim as Adame. Adame was "uncooperative" but told Torres that he had been shot near Venice Beach, on Ocean Front Walk and Washington. Neither Torres nor another police officer who testified, Kevin Pierce, received any other reports of a shooting in the Venice Beach area that evening.

The police did receive multiple reports of a shooting on Pinney Street near Pala Avenue in Pacoima at around 10:00 p.m. on the evening of March 23. Then-detective Corey Farell was dispatched to the scene, which was approximately four blocks from Gonzalez's home and just north of San Fernando Gardens, at about 11:00 p.m.

Farell observed 23 nine-millimeter cartridge casings near the corner of Pinney and Pala, a pool of blood on the sidewalk of Pinney, and a trail of blood up the walkway of the home at 13205 Pinney. Farell and other officers who secured the scene also found bullet impact marks, four bullet fragments, two bullet jackets, and abandoned cans, bottles, and other personal effects including a purse and clothing outside of 13205 Pinney. The ballistic evidence suggested that two people shot in one direction. Farell also spotted graffiti, the letters "PF" and "PJB," near the scene. Farell, who had worked as a uniformed gang officer for two years, testified that those letters were associated with the Pacoima Flats and Project Boys gangs. Farell looked for but did not find any weapons associated with the incident. None of the 18 firearms later recovered during a search of Gonzalez's home matched those used in the shooting.

After concluding his initial examination of the scene, Farell traveled to Holy Cross Hospital to speak with some of the shooting victims. Farell was unable to speak with the victims there; Terry Caver was in surgery and Vanessa Rankins, who later died from the

12

single shot to the head she sustained, was in "grave condition." Farell also went to Mission Community Hospital to speak to Anthony Jones, who had been shot in the leg, and to U.S.C. Medical Center to speak to Eric Bradshaw. Farell eventually spoke with Caver, Jones, and Bradshaw several weeks later. He described Caver as "reluctant" and "fearful," Jones as "uncooperative" and "hesitant," and Bradshaw as "very nervous" and "fearful." Farell also interviewed uninjured witnesses Kenneth "Ken Don" Perry, whom he described as "reluctant," and Anthony Jackson, who was cooperative.

Several of the individuals Farell interviewed testified at trial. Perry, an African-American man, testified that he, his girlfriend Vanessa Rankins, and his cousin and Front Street Crips member Anthony "Chubs" Jones went to Perry's aunt's house near Pinney Street and Pala Avenue at around 9:30 or 10:00 p.m. on March 23, 2010. They met Perry's cousin Eric Bradshaw there. Three others, Terry Caver, an African-American man Perry knew as "Green Eyes," and a man Perry knew only as "Happy Jack," arrived later. Perry testified that the group was "chilling" outside his aunt's house with drinks. Rankins was sitting on a planter and everyone else was standing around. No one in Perry's group had a gun.

At some point, Perry noticed a dark gray car with darkly tinted windows swerve first down nearby Ralston Avenue and then past his aunt's house. Shortly thereafter, Perry saw two men wearing black hoodies walking down Pala Avenue. Perry estimated that they were both about five feet nine inches tall and slim, though he could not be certain because their dark clothing was loose. When the men reached the corner of Pala and Pinney, one of them looked like he was going to walk toward Perry's group but the other pushed him and the duo continued to walk down Pala. At some point they stopped; one of the men paced back and forth and the other stood on a wall looking in Perry's direction.

Around that same time, about 10-15 minutes after Perry and Rankins arrived at the house of Perry's aunt, Caver drove up. Perry asked Caver to watch the two men and went to tell everybody at his aunt's house that something was up. Perry had just reached the group when he turned around and saw the two men standing shoulder-to-shoulder.

13

Perry then began to "power walk" back down the sidewalk of Pinney Street toward the two men. As Perry was walking, he saw one of the men pull a gun from his waistband. Perry saw sparks and heard repeated shots, like a "drumroll" or "chainsaw" from one gun and a "pop pop pop pop" from another. Perry took cover between some cars parked along Pinney and was not hit. When the shooting stopped about 15 seconds after it began, Perry saw that Caver's stomach was "hanging out" and "his legs were leaking blood."

Perry also saw that Bradshaw, Jones, and Rankins had been shot. Bradshaw and Jones were saying, "I'm hit, I'm hit." Bradshaw had been hit in the leg, Jones in the leg and hip, and Rankins was "laid back" with "her brains hanging out." Perry saw the dark gray car come back about 15-20 seconds after the shooting and turn right on Van Nuys Boulevard. Perry did not see the two men get into or out of the gray car.

Terry Caver testified that, on the night of March 23, 2010, he drove to 13205 Pinney Street to visit someone staying there. A lot of people often hung around outside the front of that house, and Caver had heard that the house had some connection to drug activity. When Caver pulled up, he saw a crowd of people outside the house but only recognized Perry and Happy Jack. Caver parked his car on Pala. When he got out of his car, he saw two unfamiliar people across the street, on the opposite corner of Pala and Pinney. Caver noticed the two people, who were wearing all black and had hoods on, walking toward him, but "it didn't seem important to keep looking."

As Caver began to walk to the house, Perry ran toward him. Caver testified that Perry seemed to be trying to get his attention, but ran back toward the house before saying anything. Caver heard a yell from the group standing outside the house and looked behind him. He saw the same two people he had noticed earlier with guns in their hands. The two people opened fire, with what Caver believed to be automatic or semi-automatic weapons because of the speed with which they shot.

Caver was shot nine times. He hopped toward the house, leaving a trail of blood on the concrete. When Caver reached the gate, two girls helped him get inside the house.

14

They also "got a towel and started holding [his] guts inside," which is when he realized that he had been shot in the stomach.

Paramedics cut Caver's clothing off at the scene and transported him to Holy Cross Hospital, where he stayed for fifteen days before being discharged on April 7, 2010. Caver recognized his own handwriting on a hand-drawn diagram and vaguely recalled speaking to detectives during his stay at the hospital, but did not remember much about the interviews because "they had me shot up with all type of medicine and stuff." He recalled telling officers that the shooters had been wearing all black. He also recalled being shown six photographs, but could not remember what, if anything, he told the officers about them.

Caver recognized his own voice on a tape of his interview with detectives, portions of which were played for the jury; he indicated that his voice on the tape was "dragging a little bit because [he] was under medication." On the tape, Caver told Detective Farell that the shooters had "narrow" faces and that the nose on one of the photos looked familiar. Caver also said on the tape that the shooters were about his height, five feet nine inches tall, and looked young. Caver did not remember making those statements but testified that his state of mind had been "more pure" when he was in the hospital because the events were very recent. Caver further testified that medication made him drowsy but did not make him lie.

Eric Bradshaw testified that on March 23, 2010, he was hanging out in front of a house at 13205 Pinney Street with several other people, including Ken Don Perry, Terry, Chubs, Green Eyes, and Happy Jack. At some point that evening, Bradshaw saw Caver walking down the sidewalk toward them and away from Pala. As Caver was approaching, Perry ran over and "said something about two particular dudes." Bradshaw saw two people in dark hoodies walking but did not pay attention to them or Perry's comments. Bradshaw could not tell the race of the thinly built individuals, but estimated them to be between five feet six inches and five feet nine inches tall.

Bradshaw heard someone say "duck," and then heard "over ten" fast shots fired from what sounded like a heavy gun. He saw Caver and Chubs fall to the ground.

15

Bradshaw was shot three times in the legs. Bradshaw was transported to U.S.C. Medical Center, where he was treated and released the next day. He spoke with detectives several months later. Detective Farell testified Bradshaw was "very nervous" during that interview, but "had a pretty vivid recollection of the events as he saw them and as they went down." Bradshaw told detectives that the shooters were Hispanic males and that he saw them produce guns and begin firing. He also said that one of the photos in the six-pack Farell showed him was "getting to" him–that of Gonzalez–and that he recognized another as Adame, a man from the neighborhood. Bradshaw did not remember saying these things at the interview, but testified that he had been forthcoming and honest at the time. Detective Farell agreed that Bradshaw had been forthright and candid.

The People also called Lamar Brown, a relative of Perry's friend whose family members called him "Bro." Brown was not present at the shooting but had heard about it from his family and from Ken Don, with whom he told police he had a phone conversation on the evening of March 23. During his March 27, 2010 interview with police, Brown, who was on parole at the time, told officers that Ken Don was a Front Street Crip who "was the cause of" the shooting. According to Brown, Ken Don fought with a member of the Project Boys on the afternoon of March 23 after the Project Boy accused Ken Don of "shorting" him in a crack cocaine transaction. Later that day, Ken Don saw two individuals in hoodies walk past his aunt's house. Ken Don told Brown that he thought the individuals were going to shoot at him and his friends, and that they proceeded to do just that. Ken Don told Brown that one of the shooters pulled an assault rifle from his pants and that the other was armed with a handgun. No one in Ken Don's group had a "strap," i.e., a gun. Three members of Ken Don's group were shot: his girlfriend Vanessa Rankins was hit in the face, one person was hit in the legs, and another was shot in the stomach.

Perry denied ever talking to "Bro" about the incident. Perry further denied knowing anyone named Lamar Brown. Perry also denied dealing drugs, belonging to the Front Street Crips, having personal problems with the Pacoima Project Boys or Flats, and arguing or fighting with any members of the Project Boys. Perry denied ever seeing

16

defendant Gonzalez before or recognizing anyone in the courtroom from the night of the shooting. He also stated that he was "emotionally distracted" at the time of the shootings and had been "just saying things" to detectives during the investigation and on the stand at the preliminary hearing.

Estepanie Cortez testified at trial that Gonzalez confided in her about this incident as well. He "didn't tell [her] much," only that he and Fresh walked up to and shot at a group of "niggers" because Gonzalez "hates niggers." Gonzalez also told Cortez that he and Adame ran from the scene and ultimately had someone pick them up and drive them out of the city. During a recorded jailhouse call, Gonzalez discussed an alibi that conformed to these facts and asked Cortez to assist him with it. Gonzalez wanted to get Cortez and another woman "on the same page" about Adame being shot while they were walking on Venice Beach. Cortez also discussed the Venice Beach alibi with Adame and Adame's mother.

### D.     The March 24 Incident (Count 16)

On March 24, 2010, Edwin Henriquez, a member of the North Hollywood Locos gang, planned to meet his friend, Danny Perez. Perez had arranged for a female to give Henriquez a ride from his house to Perez's and Rangel's apartment. When the car arrived to pick up Henriquez, the female was accompanied by three males. Henriquez recognized one of the males, the driver, as Casper, whom he identified in court as Gonzalez. He recognized another as Trippy's brother; he identified Trippy as Rangel in court. Henriquez recalled that the others told him they were going to drop off Trippy's brother at his house. He testified that he did not remember anything beyond that point but knew he was shot in the head that day. He also testified, however, that snitches can get killed and that was why he said he did not remember anything on the stand and also why he said the same thing to police officers who spoke to him at the hospital. Henriquez was in the hospital for over two months, lost an eye, and continues to have seizures as a result of the shooting.

Erick Davalos testified that he was one of the passengers in the car. Gonzalez and a male from the North Hollywood Locos that Davalos knew as "Darky" (Henriquez) also

17

were there. According to Davalos, Rachel, the owner of the car, was sitting in the front passenger seat, and a man was driving. Gonzalez was in the back with Davalos and Darky. Davalos heard Gonzalez "bang on" Darky, which two gang experts explained means asking a suspected gang member "where are you from" and eliciting violence if the respondent is from a rival gang. When Gonzalez "banged on" Darky, Darky said he was from the North Hollywood Locos. The North Hollywood Locos were not active rivals of the Project Boys and Flats, but they were "not exactly friends either."

Davalos was supposed to be dropped off at Rangel's apartment. Before the car arrived there, however, it stopped near Desmond Street in Pacoima. Gonzalez and Darky got out of the car and walked toward Desmond Street. They were gone for about five minutes. Davalos heard gunshots, and Gonzalez came running back to the car. Darky did not come back. Gonzalez told everyone in the car that he and Darky had been shot at and that Darky had run the other way. Gonzalez told them to get away from the area, and the car drove off. Davalos never saw Darky again after that, but heard from Adame a few days later that Darky was in the hospital. Adame also told Davalos that Gonzalez shot Darky. During a jailhouse phone conversation with Cortez, Gonzalez stated that Davalos had seen some things that he shouldn't have seen and expressed concern about him snitching.

Detective David Hunt testified that he and his partner were dispatched to the area of Desmond Street and Telfair Avenue at around 11:20 p.m. on March 24, 2010. Hunt saw a Hispanic male lying on the sidewalk with a bullet wound in the side of his face. The victim's eye "had popped out" and "was laying on his cheek," and he was covered in blood.

Hunt recovered six bullet casings and two bullet fragments from the scene of the crime. A firearms analyst opined that all of the casings came from a single nine-millimeter gun. She further opined that the casings came from an automatic or semi-automatic weapon and matched some of the casings recovered from the Pinney and Pala shooting the day before. The type of gun that ejected the casings could sound like a chainsaw when fired.

18

## E. Gang Evidence

According to the two gang experts who testified, the Pacoima Flats gang originated in the 1970s in the San Fernando Gardens apartment complex. It had about 250 members at the time of trial. It shared territory and an "informal alliance" with its "brother gang," the Pacoima Project Boys, which was founded later but had about 300 members at the time of trial. The area of Pinney Street and Pala Avenue, which had high levels of drug activity, was within the territory of both gangs. Both gangs used symbols and abbreviations to represent themselves. The Flats used the shorthand "Pacas" and "PF," the latter of which had a corresponding hand signal. Members also wore Pittsburgh Steelers and Pirates attire because they had the letter "P" for Pacoima on them. The Project Boys referred to themselves as "Proyectos," "Projects," "Jets," or "PJB." They frequently wore New York Jets and Toronto Blue Jays attire, and used a "PJ" hand signal. Members of both gangs signified their status as "warriors" by getting Aztec-themed tattoos. Gonzalez had the letter P tattooed on one arm and F on the other. He also had an F on his finger, "Pacas" on his leg, and "Pacoima Flats" on his back. Adame had Aztec-themed artwork tattooed on his chest and left arm, and was shown "throwing" gang hand signals in several photographs.

Gangs have female members and associates. Associates are individuals who have not been formally initiated into a gang but still hang out with the members. The female associates often are the girlfriends of male gang members. They assist the gangs by driving vehicles, acting as lookouts, hiding contraband, providing alibis, and passing messages in and out of jail. Performing these and other tasks allows females to demonstrate their loyalty to and elevate their status within the gang. Rodriguez, an associate of the Project Boys, was christened "Danny Girl" after her boyfriend, gang member Danny Orozco, was murdered in 2009. Rangel was a known associate of the Project Boys and Flats.

Sometimes male gang members used force or threats to get female associates to commit crimes. The commission of crimes, from petty vandalism to more serious drug, robbery, and assault offenses, was a primary activity of both the Project Boys and the

19

Flats. Members "put in work" and "earned their stripes" by committing crimes; more serious crimes merited more recognition or respect from the gang. Gang members typically committed crimes in the presence of other members or associates, both to verify the commission and to have assistance available if necessary. It was not unusual for members and associates of the Project Boys and Flats to commit crimes together; their reputations within both gangs would be elevated if they were successful. Certified court records showed that a member of the Project Boys and a member of the Flats were convicted of murder together. Certified court records further showed two additional convictions for murder, one by a Project Boy and one by a Flats member, as well as the conviction of a Flats member for being a felon in possession of a weapon.

The Project Boys and Flats both disliked African Americans. They also had similar rivals, including the Knock Knock Boys. Both gangs identified rivals by asking unfamiliar individuals the question, "Where are you from," which was also known as "banging on" them or "hitting them up." If the unknown person belonged to a rival gang, he or she would be subject to a violent response. Violent retaliation also typically followed when a rival did something to a gang member. Prompt retaliation to rivals was required to avoid being perceived as weak. Gang members also retaliated against "snitches," individuals who cooperated with police or testified in court. Gang members would tolerate the presence and criminal activity of non-rivals within their territory if the interlopers paid "taxes" or "rent" to the gang.

When presented with hypotheticals based on the facts of the three incidents charged in this case, gang expert Rodolfo Rodriguez opined that all three crimes were committed for the benefit of the Project Boys and Flats gangs.

## III.    Defense Evidence

Defendants Gonzalez and Rodriguez presented evidence. Defendants Adame and Rangel did not.

### A.      Defendant Gonzalez

Gonzalez called one witness, Eduardo Ceballos, who testified that he lived up the street from Gonzalez's home for 15 years and occasionally played basketball there. He

20

testified that in 2010 Gonzalez's backyard was completely enclosed by a wooden fence that was 7-8 feet tall.  He also said that there was a second, chain-link fence near the house.  Ceballos testified that Gonzalez's father died about ten years before the events in this case, which contradicted Detective Eric Reade's testimony that he had spoken to Gonzalez's parents while searching Gonzalez's home.

### B.    Defendant Rodriguez

Defendant Rodriguez called prosecution witnesses Alexis Garcia and Detective Byers. Garcia testified that she did not know anything about the March 23, 2010 shooting at Pinney and Pala.  Byers testified that he had spoken to Davalos on January 31, 2013, about a week before Davalos took the stand at trial.  At that time, Davalos told Byers that he met Danny Girl, defendant Rodriguez, through her boyfriend about two weeks prior to the events in this case.  Uncontroverted evidence admitted earlier at trial showed that Rodriguez's boyfriend, a member of the Project Boys, had been murdered in 2009, a year before the events in this trial.

Rodriguez also called pathologist and toxicology expert Dr. Marvin Pitruszka. Pitruszka explained that methamphetamine has both short- and long-term effects. Immediately after ingesting the drug, users typically become alert, euphoric, energetic, and may have heightened perceptions of light and sound.  Over hours and days, however, methamphetamine tires and injures the body, causing drowsiness, confusion, and difficulty in concentrating, remembering, and decision-making.  Users frequently "talk about being stupid, they can't remember certain facts."  These effects render users unreliable "for performing executive function[s]" like "thinking clearly" and making clear observations.  When presented with a hypothetical about a methamphetamine user who shared the usage patterns and physical characteristics of Alexis Garcia, Pitruszka opined that the hypothetical individual would have injured brain cells and compromised abilities to process and remember information.  On cross-examination, Pitruszka conceded that the effects of methamphetamine could vary from user to user.

Rodriguez's final witness, private investigator Luis Reynoso, also called into question Garcia's ability to perceive the March 15-16 shooting.  At about 11:45 p.m. on

21

February 8, 2013, Reynoso visited the location from which Garcia testified she viewed the shooting. He observed and took photographs of the intersection, as well as wrought iron fences and seven-to-nine-feet hedges around the houses where Garcia was standing. The court also took judicial notice that there was a new moon on March 15, 2010.

## DISCUSSION

All four defendants have appealed. Because each defendant filed his or her own briefs and raised separate issues, we have organized our discussion by defendant. We note, however, that each defendant has joined and adopted by reference the arguments made by the others to the extent that the others' arguments may inure to his or her benefit. (See California Rules of Court, rule 8.200(a)(5); *People v. Smith* (1970) 4 Cal.App.3d 41, 44.) Accordingly, "we shall consider all contentions as though made on behalf of all appellants to whom they might be available." (*People v. Smith*, *supra*, 4 Cal.App.3d at p. 44.) We will clarify the scope of our analyses as necessary throughout.

## I.     Defendant Gonzalez

Defendant Gonzalez contends that several instances of improper conduct by his counsel, the prosecutor, and the court deprived him of a fair trial. For the reasons explained below, we disagree and affirm his convictions.

### A.     Ineffective Assistance of Counsel

Gonzalez contends that he was denied his state and federal constitutional rights to effective counsel because his privately retained counsel, Natalie Dodson, suffered from actual conflicts of interest that caused her to place her own interests above his. According to Gonzalez, these alleged conflicts consisted of Dodson's financial incentive to minimize her efforts on Gonzalez's behalf and her desire to protect her own professional reputation and avoid criminal prosecution under section 1045.2, subdivision (a). Gonzalez argues that these conflicts adversely affected Dodson's performance at trial in a variety of ways. In his view, Dodson "should not have represented appellant after his preliminary hearing and that [*sic*] thereafter, as her actual conflict compromised her ability to effectively represent appellant, should have asked to be relieved due to her divided sense of loyalty and her not being paid for trial." Gonzalez further contends that

22

Dodson concealed from him the true extent of her conflicts, which prevented him from making a timely motion to discharge her.

### 1. Background

#### a. Fee Arrangement

Gonzalez retained Dodson at some point prior to the initial preliminary hearing in October 2010.[7] Dodson represented Gonzalez from the time of that first preliminary hearing through his sentencing in June 2013. The terms of their fee arrangement and representation agreement are not in the record. However, Dodson did make two relevant comments on the record, outside the presence of the jury, toward the end of the three-month trial. On one occasion, she said she was "paid $5,800 to do the case." On another, during a hearing to show cause for her untimely arrival at trial one day, Dodson stated that she was "stressed out" because she was "not getting any money for this trial." The court sanctioned Dodson $250 for her tardiness.

#### b. Disclosure of Witness Names to Cortez

Gonzalez's former girlfriend, Estepanie Cortez, was a prosecution witness at the second preliminary hearing and at trial. Cortez attended but did not testify at the first preliminary hearing.

Immediately upon taking the stand at the second preliminary hearing, Cortez testified that Dodson had given her documents related to the case. There "were some names in the paperwork," including those of Alexis Garcia and defendant Rangel, and Cortez testified that she had relayed to Gonzalez the names of individuals who made statements about him. Adame's attorney, Steven Flanagan, requested a hearing to discuss the "repercussions" of Dodson's disclosure of witness information to Cortez in light of section 1054.2, subdivision (a), which prohibits attorneys from disclosing "to a defendant, members of the defendant's family, or anyone else, the address or telephone

---

[7] The People initially charged Gonzalez, Rodriguez, and Rangel in 2010. Defendant Adame, who had fled to Mexico, was not charged in the initial information. After Adame was apprehended, the People dismissed the first information and re-filed the case against all four defendants in 2011.

number of a victim or witness whose name is disclosed to the attorney pursuant to subdivision (a) of Section 1054.1." The lead prosecutor, Tannaz Mokayef, noted that recorded jailhouse conversations corroborated Cortez's testimony about the reports and agreed with Flanagan that a hearing might be warranted. The court asked Dodson to consider over the lunch hour whether there was any reason that the preliminary hearing could not proceed.

None of the defendants was present when the hearing reconvened after lunch. No one objected to their absence or requested their presence, and the court heard argument in their absence.

Flanagan expressed concern that Dodson could become a witness in the case because she "is the only person who can impeach this particular witness and that creates a conflict of interest." He emphasized that it was unclear whether Cortez "knows what she knows from Mr. Gonzalez' mouth, or if she has actually learned something from the police reports that she purportedly reviewed." Mark P. Brandt, Rodriguez's attorney, echoed Flanagan's concern that Cortez could be conforming her testimony to what she read in the reports and stated that he did not "see how [Dodson] cannot be a witness" because she would need to clarify when she gave the reports to Cortez. Brandt also suggested that a conflict would arise between Dodson's personal interest in showing that she did not violate section 1054.2, subdivision (a), by providing improper information to a witness, and her client's interest in showing that Cortez received her information not from him but from the documents Dodson shared with her. Mokayef argued that cross-examining Cortez should be sufficient to reveal the source of her information. Mokayef also noted that it was not clear how detailed the documents were, whether they were redacted, or whether Dodson engaged in any wrongdoing by sharing them with Cortez.[8] Mokayef did not believe that the issue would affect the preliminary hearing. Dodson

---

[8] Dodson maintained that the police reports she shared with Cortez were redacted and did not contain any prohibited information. The documents are not in the record before us. We express no opinion as to whether the reports were redacted, whether section 1054.2, subdivision (a), was applicable, or whether Dodson may have violated that or any other statute or rule by sharing documents with Cortez.

declined to be heard on the issue. Rangel's attorney, Frank DiSabatino, "join[ed] on behalf of Ms. Rangel" after the court ruled on the issue.

The court ruled that the preliminary hearing could proceed. It noted that "[t]he issues that counsel have raised may come up and they may not," and declined to "terminate these proceedings on the hypothetical that a conflict may arise." Instead, it ruled, "we'll proceed for now and we'll see what happens." Defendants returned to the courtroom, and the hearing proceeded.

Flanagan cross-examined Cortez about her receipt of documents. Cortez conceded that she was "confused" about whether the information she testified to came from Gonzalez, the previous preliminary hearing, or the documents she received from Dodson. She made similar concessions at trial.

### c. Pretrial Motion Regarding Disclosures to Cortez

At a pretrial hearing on the eve of trial, with defendants present, Dodson made an oral motion pursuant to Evidence Code section 402. She informed the court (now presided over by a different judge) that she "had an issue at preliminary hearing where Ms. Mokayef accused me of turning unredacted copies of the police report to my client, and associates of Mr. Gonzalez." Dodson represented that she had received only redacted copies of the reports and requested that no questions be "asked in regards to that" because she did not "wish for any integrity attacks to unjustifiably be lodged during the trial in front of the jury."

Mokayef responded that Dodson's alleged provision of information to Cortez "becomes a gang issue in the trial in the sense of trying to intimidate and get at witnesses," because Gonzalez "is heard on numerous calls, tapes, saying to get at certain witnesses, and the way he knows of these witnesses is because he has been provided those witnesses by his attorney." Mokayef further indicated that she planned to "introduce the request of [Gonzalez] to his girlfriend to get paperwork from the attorney so that he can get the witnesses to pass out [sic], and then there is another recording where he actually talks about the witnesses to other people he has called, asking for them to get at the witnesses. That's it."

The court asked whether Mokayef intended "to introduce or mention in any way that Ms. Dodson engaged in any inappropriate conduct," and she responded, "[n]ot in front of the jury, no." Mokayef suggested that she could say that Cortez got the documents "from the attorney, an attorney" in lieu of identifying Dodson as the source. Dodson said that was fine with her. The court accordingly ordered the People "[o]r any of the other attorneys" not to "mention Ms. Dodson's name in connection with that reference of the course of the documents."

No one mentioned Flanagan's and Brandt's previous concerns about Dodson potentially becoming a witness in the case.

### d. Jailhouse Recordings

During trial, the People played several recordings of jailhouse conversations involving Gonzalez. It is undisputed that transcripts of the recordings were provided to defense counsel in discovery. Dodson did not file any pretrial motions to exclude the recordings.[9]

One of the recordings contained a lengthy conversation involving Danny Perez, Gonzalez, and various third parties. Dodson objected to the recording on relevance grounds, well into the playing of the approximately 80-minute recording. She also objected that the tape was cumulative and a waste of time. The court overruled all of her objections and permitted the People to play the recording in its entirety.

According to the transcript of the recording, Gonzalez told an unidentified male that his lawyer "was supposed to come today so I'm going to go ahead and call her right now in a little bit . . . . so I can get that paperwork . . . ." Gonzalez continued, "this bitch is hard to get a hold of. But I finally got a hold of her and she's supposed to come sometime today." Later in the conversation, Gonzalez asked Perez to "call my dumb-ass - - call my attorney up, please." Later still, Gonzalez and Perez reached the following

---

[9] Dodson previously had made a motion under Evidence Code section 352 to exclude a conversation in which Gonzalez and Perez engaged in "phone sex." The court ultimately permitted the People to introduce the fact that Gonzalez and Perez had a sexual relationship but excluded the "sex tape" itself as "extremely prejudicial."

26

voicemail message: "Hello, you've reached attorney Natalie Dodson, please leave me a message and I will call I [*sic*] right back."

After the recording finished playing, Dodson objected that it violated the court's "ruling about the 402 regarding the paperwork and Mr. Gonzalez." She also reiterated her objections that the recording was cumulative and irrelevant. The court disagreed.

The court also overruled Dodson's objections to the jury hearing all of the taped calls Gonzalez made during the three years he had been in custody, and noted that Dodson's objections should have been made earlier. Dodson responded that she did not know that the court would permit the People to play lengthy recordings in their entirety when only small portions were relevant. Flanagan objected to "editing the tapes," because editing "takes the flavor away from the whole tape." The court agreed with Flanagan's assessment but indicated that it was open to "a simple redaction." The court reminded Dodson to "make sure you make the proper objections before the tape is played."

The People also played for the jury several recorded conversations between Gonzalez and Cortez. Dodson objected to the first recording as irrelevant, prejudicial, and cumulative, but only after part of it already had been played for the jury. The trial court overruled Dodson's objections, finding the recording more probative than prejudicial under Evidence Code section 352. The jury consequently heard Gonzalez say that his lawyer was "going to push for the preliminary hearing already so she could try to talk to that witness, and that she's going to make a fool out of that witness . . . . she's going to have fun with her." He also told Cortez that "I told her to give you a copy of the police report and everything." Later during the call, Gonzalez asked Cortez if his "stupid-ass lawyer" had called. When Cortez said no, Gonzalez asked, "where did you guys find her at?" Cortez replied that the attorney "used to be Marvin's lawyer." Gonzalez responded, "she's kind of smoked the fuck out, huh?" and Cortez replied, "Yeah." Gonzalez added, "She looks like she's a good lawyer though, like – I don't know, but, smoked out."

27

Dodson objected to the next recorded call before it was played, but the court overruled her objection on Evidence Code section 352 grounds. The jury thus heard Cortez complain about Gonzalez's "damn lawyer" not calling her back. Gonzalez replied, "I know. That bitch is smoked out. She said she's going to call you on Friday."

Before the next tape was played, Dodson asked for a sidebar "on some of the stuff that's going to be said in this transcript." At sidebar, Dodson complained that she had "been called dumb ass, stupid ass by [her] own client" and worried that she was "losing credibility with the jury" as a result. She moved for a mistrial, "based on the fact that I have already lost too much credibility, and if this tape is allowed to be played, I will definitely really not be taken seriously by anyone anymore." The court indicated that it did not "see the probative value of additional insults to her" and agreed "with Ms. Dodson that the negative, cumulative comments made by her client are really, at this point, not necessary." The court accordingly ordered the People to redact several negative comments about Dodson, including that she "is kind of smoked the fuck out," "looks like a smooth little tweaker," and "got some people out of some shit before with witnesses." The court also reiterated its earlier ruling that Dodson was not to be mentioned by name as the source of the documents Cortez received, even as Flanagan argued that it would be "almost impossible to keep Ms. Dodson's name out of it" during his planned cross-examination of Cortez. The court denied Dodson's motion for mistrial notwithstanding Flanagan's additional argument that Dodson could become a witness if Cortez "testifies to something other than the truth."

The court cautioned counsel that it would not be entertaining further 402 motions in the middle of testimony. The court offered to hear any remaining 402 motions the next morning before the jury arrived. Dodson advised the court that she had reviewed the transcripts but expressed concern that she would be "required to bring up all the potential 402's based on two boxes of transcripts" by the next morning. The court told Dodson "to assume the People are going to introduce all of them" and make any necessary motions accordingly. The record does not reflect that any attorney took advantage of the court's

28

offer to hear Evidence Code section 402 motions early the next morning; the transcript picks up at 9:30 a.m. with testimony from Cortez.

The following day, the People played a recording in which Cortez and Gonzalez mentioned that Gonzalez's lawyer "was scolding" him about a visible tattoo he had gotten while in custody.  Gonzalez said she told him, "You could have at least got it on your butt cheek or on your you-know-what."[10]  The jury also heard that Cortez gave "Natalie's" number to Adame, and heard Gonzalez and Cortez refer to the "Jerry Springer girl" and "the cracked out lady" before the People stopped the tape.  At a sidebar, the court, the People, and Dodson all agreed that it was unclear whom Cortez and Gonzalez were discussing.  Nonetheless, Dodson objected that "everything that's been said about me, I have completely lost credibility," and that "the jury has already heard so much stuff, I think the damage has already been done."  She complained, "I think I'm pretty much ineffective.  None of them will even look at me."  The court stated for the record that it had "not seen that," and the People echoed the court's assessment.  Dodson also informed the court that Gonzalez "doesn't feel I can represent him anymore," which the court characterized as a "different issue."

### e.    Gonzalez's Motion to Discharge Dodson

The court took up that issue during a break later that day, the 43rd day of trial (including jury selection).  Dodson informed the court that "Mr. Gonzalez believes I have been so undermined in my credibility that he wouldn't like to have me as his lawyer any longer."  She also reiterated her earlier comments that she "believe[s she's] completely ineffective as his counsel," that she no longer had "any credibility with the jury," and had "been called horrible names by" Gonzalez.  She continued, "I feel I'm on trial, that I need

---

[10] The People stopped the recording at that point, which means, contrary to Gonzalez's suggestion, the jury did *not* hear Gonzalez state that Dodson suggested she and Gonzalez take a hiking trip together once she got him out of custody, said she loved talking to Gonzalez because he is "fucking hilarious," was "always acting all hyper and shit," and was "like us, baby."  The unredacted transcripts were admitted into evidence, however.

to defend myself to the jury and my colleagues in this courtroom, as opposed to defending Mr. Gonzalez."

Gonzalez personally told the court, "I feel like my lawyer is not going to represent me to her full 100 percent, and I think she might hold it against me, and so would the jury. While you guys keep going to the back and doing sidebars, they are reading and laughing. You guys don't see it. You are in the back. Even if it is off the record, they are still reading it. It is still in their hands. I think that is prejudicial and will affect me in every way."

Mokayef argued that Gonzalez's name-calling on the recordings did not render Dodson ineffective. She also argued that Gonzalez hired Dodson and "chose to say the words he said about his attorney," and that "the court redacted most of the statements regarding this attorney."

The court denied Gonzalez's request to discharge Dodson as untimely and likely to significantly prejudice him and unreasonably disrupt the trial. The court cited *People v. Ortiz* (1990) 51 Cal.3d 975 in support of its decision. The court also advised Gonzalez that it had instructed the jury not to read the transcripts during sidebar, that it presumed the jury followed the instruction, and that "we cannot speculate that they were reading something about the attorney and laughing about that."

Two days later, Dodson put the following statement on the record outside the presence of the defendants and the jury: "I'm afraid I might have said I'm ineffective. If I said that, I meant it in the context of I believe I had been prejudiced with the jury regarding the comments that Mr. Gonzalez said on the telephone, not that I felt like my lawyering or my strategies or my representation of him was ineffective. Just that I felt I had been discredited." The court responded, "I understood that to mean it like that, but I'm glad you're clarifying that. Your comments were limited to the jury hearing the negative comments?" Dodson agreed, and the court thanked her again for clarifying.

### f.      Cortez Cross-Examination

During her cross-examination of Cortez, Dodson asked a series of questions about Cortez's receipt of police reports from "the lawyer." Cortez denied ever discussing doing

anything illegal with the reports or setting up a story with the lawyer. She also agreed with Dodson that the "sole purpose of [Cortez] receiving those reports [was] to investigate and come up with a valid defense, a truthful defense, for Mr. Gonzalez."

Flanagan also addressed the issue of the reports while cross-examining Cortez. He asked Cortez if it was correct that she "picked up those police reports from Mr. Gonzalez's attorney's office," "sometime in April of 2010," and that "it was an ongoing process . . . that continued up through the end of 2010." Cortez affirmed the correctness of all these statements. She further affirmed that she had spoken with Gonzalez's attorney "more than ten times" during 2010 and got "additional information about Mr. Gonzalez's case from this attorney." She also testified that she had observed the initial preliminary hearing and "heard everything the witnesses said."

### g.    Additional Alleged Instances of Ineffective Representation

Gonzalez characterizes five additional incidents as exemplary "of how counsel's conflicts of interest hampered her representation of appellant." First, he notes that Dodson asked one of the People's gang experts if he had been "informed that Mr. Gonzalez had been convicted - -." Mokayef interrupted Dodson midsentence with an objection, and Dodson explained in chambers that Gonzalez never had been convicted of a gang crime and that she was "trying to show he is not in a gang." The court sustained Mokayef's objection and expressed "grave concern" that Dodson was "bringing up a conviction."[11]

Second, Dodson opened her cross-examination of Sergio Abrego, who was in custody and wearing a prison-issued jumpsuit at the time he testified, by asking him, "Where did you get that outfit? Shopping for your ex-boyfriend for - - " Mokayef objected. Dodson apologized and, before the court ruled, continued, "Does she want an orange jumpsuit for her ex-boyfriend?" The court interjected, "Counsel, please, that's

---

[11] We note that the jury already had heard evidence that Gonzalez had at least one prior contact with the criminal justice system. During her direct examination of Danny Perez, Mokayef asked Perez where he met Gonzalez, and Perez responded, "He was locked up with my little brother."

31

not a proper comment." Dodson apologized again and continued her cross-examination without further incident.

Third, Dodson left the courtroom while Rangel's attorney, Brandt, was making an offer of proof as to certain testimony he sought from Alexis Garcia. It is not clear from the record why Dodson left. The short hearing, which was held at the end of the day outside the presence of the jury, continued without her.

Fourth, Dodson's attempts to present Gonzalez's mother and Detective Farell as defense witnesses were unsuccessful, and she did not call the neighbor she originally suggested she would. The sole witness Dodson ultimately called testified only that Gonzalez's father died about ten years before 2010 and that his house was surrounded by a wooden fence and additionally had a chain-link fence in the back.

Finally, during the People's closing argument, the court admonished Dodson for nodding at the jury. Outside the presence of the jury, Dodson argued that the court's admonishment "showed prejudice" because the court "allowed the prosecutor to nod, make faces, do this the entire time during this trial." She also stated that she thought it "was okay to look at the jury and nod and shake my head because Ms. Mokayef has done it this entire trial." The court denied observing any other attorney "look directly at the jury, [and] nod to them with your head up and down," and stated that such behavior was "completely inappropriate."

### 2. Applicable Law

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's

32

reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an appellate claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

"The federal and state constitutional right to counsel in a criminal case also includes the right to representation free of conflicts of interest that may compromise the attorney's loyalty to the client and impair counsel's efforts on the client's behalf. (E.g., *Glasser v. United States* (1942) 315 U.S. 60, 69-70; *People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).) For both state and federal purposes, a claim of conflicted representation is one variety of claim that counsel provided ineffective assistance. Hence, to obtain reversal of a criminal verdict, the defendant must demonstrate that (1) counsel labored under an actual conflict of interest that adversely affected counsel's performance, and (2) absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different. (*Mickens v. Taylor* (2002) 535 U.S. 162, 166 (*Mickens*); *Doolin*, *supra*, 45 Cal.4th at pp. 417-418, 421; see *Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)" (*Mai*, *supra*, 57 Cal.4th at pp. 1009-1010.) Even where an attorney labors under an actual conflict of interest, a defendant must show more than a "mere theoretical division of loyalties" to demonstrate deficient performance. (*Mickens*, *supra*, 535 U.S. at p. 171.) Additionally, prejudice is not presumed unless defense counsel was representing two or more defendants concurrently. (*People v. Almanza* (2015) 233 Cal.App.4th 990, 1006; *Doolin*, *supra*, 45 Cal.4th at pp. 428-429.)

"When addressing an appellate claim that a conflict of interest adversely affected counsel's performance, the reviewing court is '"bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect

33

such an omission.  We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission."  (*People v. Cox* (2003) 30 Cal.4th 916, 948-949.)'  (*Doolin*, *supra*, 45 Cal.4th 390, 418.)"  (*Mai*, *supra*, 57 Cal.4th at p. 1010.)  Essentially, we examine whether the alleged conflict caused the attorney to "pull [her] punches," or not represent defendant as vigorously as she might have absent the conflict.  (*Doolin*, *supra*, 45 Cal.4th at p. 418.)

"The right to retained counsel of choice is—subject to certain limitations—guaranteed under the Sixth Amendment to the federal Constitution.  (*U.S. v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144, 151-152; *People v. Ramirez* (2006) 39 Cal.4th 398, 422.)  In California, this right 'reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain.'  (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*); see Code Civ. Proc., § 284.)  The right to discharge a retained attorney is, however, not absolute.  (*Ortiz*, [*supra*, 51 Cal.3d] at p. 983.)  The trial court has discretion to 'deny such a motion if discharge will result in "significant prejudice" to the defendant [citation], or if it is not timely, i.e., if it will result in "disruption of the orderly processes of justice" [citations].'  (*Ibid.*; see *U.S. v. Gonzalez-Lopez*, [*supra*, 548 U.S.] at p. 152 [a trial court has 'wide latitude in balancing the right to counsel of choice against the needs of fairness' and 'against the demands of its calendar'].)"  (*People v. Verdugo* (2010) 50 Cal.4th 263, 310-311; see also *People v. Maciel* (2013) 57 Cal.4th 482, 512.)

### 3. Analysis

#### a. Dodson did not have an actual conflict

Gonzalez contends that "retained counsel suffered from an actual conflict because she believed, whether correctly or not, that she could be called as a witness, that it was necessary for her to defend herself because the prosecutor had accused her of a crime and to do so admittedly put her own personal interest ahead of defending her client, and

34

because she had not been paid to do this trial she would not file 402 motions prior to trial or even during trial." We reject these contentions.

There is no evidence in the record that Dodson at any time believed that she would be called as a witness. The trial court prohibited the mention of Dodson's name in connection with Cortez's receipt of documents. Moreover, Dodson's name did not appear on any witness lists, Flanagan successfully cross-examined Cortez without calling Dodson as a witness, and there is no indication that the People took any follow-up action on the potential section 1054.2 issue raised during the preliminary hearing. Dodson explained that her comment about needing to defend herself – which she made outside the presence of the jury – pertained to "the comments that Mr. Gonzalez said on the telephone," not the alleged misconduct or conflict of interest. On the record before us, we are not persuaded that Dodson's provision of documents to Cortez would "inevitably require testimony that might create a conflict of interest" (*People v. Ayala* (2000) 23 Cal.4th 225, 285), or that "Ms. Dodson knew or should have known that she had an ethical duty to ask the court to relieve her as counsel in that there was a real probability that she would be called as a witness to testify."

The suggestion that Gonzalez's fee arrangement with Dodson gave rise to an intractable conflict is even less persuasive. As our Supreme Court has observed, "'"[A]lmost any fee arrangement between attorney and client may give rise to a 'conflict.' An attorney who received a flat fee in advance would have a 'conflicting interest' to dispose of the case as quickly as possible, to the client's disadvantage; and an attorney employed at a daily or hourly rate would have a 'conflicting interest' to drag the case on beyond the point of maximum benefit to the client. [¶] The contingent fee contract so common in civil litigation creates a 'conflict' when either the attorney or the client needs a quick settlement while the other's interest would be better served by pressing on in the hope of a greater recovery. The variants of this kind of 'conflict' are infinite. Fortunately most attorneys serve their clients honorably despite the opportunity to profit by neglecting or betraying the client's interest."' (*Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 618-619, fn. 8.)" (*Doolin*, *supra*, 45 Cal.4th at p. 416.)

Because Gonzalez's ineffective assistance claim has reached us on direct appeal rather than in a petition for habeas corpus, the record sheds little light on his fee arrangement with Dodson. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1031.) We know only that Dodson said she was "paid $5,800 to do the case," and that she was "stressed out" because she was "not getting money for this trial." The flat fee Dodson allegedly received is minimal compensation for a trial of the magnitude and duration of a case such as this—it barely exceeds $100 per day of the trial. The relative lack of compensation alone does not give rise to an impermissible conflict of interest, however. (*People v. Castillo* (1991) 233 Cal.App.3d 36, 61-62.) More importantly, nothing in the record suggests that Dodson was proceeding unwillingly. (See *Ortiz*, *supra*, 51 Cal.3d at p. 985.) To the contrary, she did not move to withdraw due to a lack of compensation, and insisted on persevering through trial even after enduring a vicious, disfiguring dog attack so serious that she was hospitalized and her doctor ordered her not to work for a week.

### b. Dodson's performance, even if inadequate, did not prejudice Gonzalez

Gonzalez contends that "[a]s a result of the actual conflict, Dodson's performance was deficient and it is reasonably probable it adversely affected the outcome of the case." Because we find that no actual conflict existed, we necessarily reject this argument. We also note that there is nothing in the briefs or the record linking the alleged conflicts to Dodson's allegedly deficient performance, let alone demonstrating that the alleged incidences of deficiency "can be attributed only to the financial [or other] conflict defendant urges." (*Doolin*, *supra*, 45 Cal.4th at p. 423.) For instance, there is nothing to suggest that Dodson's purported fear of being called as a witness or her financial distress motivated her two most inappropriate actions, nodding at the jury and insulting witness Abrego. Even if there were some link between the putative conflicts and Dodson's performance, Gonzalez has not shown that Dodson's performance, deficient or not, resulted in such prejudice to him that it is reasonably probable the result of the proceeding would have been different absent the alleged errors.

36

"If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150; *People v. Banks* (2014) 59 Cal.4th 1113, 1170, overruled in part by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) We take that approach here, noting that Gonzalez "does not argue that Dodson's failure to file 402 motions [the centerpiece of her alleged inefficacy] adversely affected the outcome."[12]

Gonzalez contends that Dodson's performance nonetheless prejudiced him because there was no physical evidence tying him to the charged crimes and "every civilian witness called by the prosecution was threatened by either law enforcement or the prosecutor, had a motive to lie and admitted that they did lie." Although we agree with Gonzalez that the physical evidence implicating him was minimal and that many of the witnesses had potential credibility problems, we cannot conclude on this record that there is a reasonable probability that the outcome would have been different absent Dodson's alleged errors. Not only did Dodson's alleged errors have little relation to the substantive evidence against Gonzalez, but that evidence also was strong and substantial. The People's gang evidence was uncontroverted. Each eyewitness, biased or not, told a story that generally hung together with those of the other witnesses, despite cross-examination by multiple defense attorneys. For instance, Garcia's testimony about Gonzalez's involvement in the March 15-16 shooting was corroborated by testimony from Davalos, Abrego, Cortez, and Reade. Rangel's letter and the phone records lent further support, as did the uncontroverted evidence of Gonzalez's gang membership and

---

[12] Although we do not decide whether Dodson's handling of the jailhouse recordings in which Gonzalez disparaged her character constituted deficient performance, we reject Gonzalez's claims that Dodson "admittedly had not read" the transcripts of Gonzalez's recorded jailhouse calls. None of the record citations Gonzalez provides supports his contention that Dodson did not review the tapes. To the contrary, Dodson, an officer of the court (*People v. Palmer* (2013) 58 Cal.4th 110, 119), affirmatively represented – twice – that she had reviewed the transcripts. She indirectly made the same representation numerous times throughout the trial, both through statements demonstrating knowledge of their contents and by moving to exclude certain portions of them.

his gang's rivalry with Abrego's. Three victims of the March 23 incident gave accounts that squared with Cortez's and Davalos's purportedly "biased" testimony, which in turn found corroboration in Gonzalez's own recorded jailhouse discussion of alibis. Henriquez's testimony about the March 24 incident also lined up with the testimony of Officer Huntand Davalos. On this record, we are satisfied that there is no reasonable probability that the verdict would have been different had Dodson not harbored alleged conflicts of interest.

### c. The trial court properly denied Gonzalez's motion to discharge counsel

Gonzalez claims that his "failure to bring a timely motion" to discharge Dodson "was due to Dodson's failure to be candid with her client and the court" regarding her alleged conflicts of interest. He claims that he "was not notified at the preliminary hearing or just prior to trial that there was a conflict of interest which would cause his attorney to abandon her duty to act as his diligent advocate." The implication is that if he had been aware of Dodson's alleged conflicts of interest, he would have sought – and obtained – alternative counsel in a more timely fashion, at the pretrial conference on November 26, 2012, rather than waiting until the 43rd day of trial to try to discharge Dodson.

We reject these contentions. As discussed above, Dodson was not laboring under an actual conflict of interest. But even if she were, we are not persuaded that Gonzalez's absence from a single sidebar conference memorialized in roughly 10 pages of transcript deprived him of the knowledge needed to make a timely request to obtain new counsel. "We do not dispute that a defendant may be entitled to be present at a conference called to consider whether to remove his counsel for conflict of interest or any other reason, because the removal of counsel will affect defendant's representation at trial, and is a matter on which defendant's views should be heard." (*People v. Perry* (2006) 38 Cal.4th 302, 313.) Here, however, Gonzalez was present when the potential conflict initially was raised, and was fully aware that Dodson shared information with Cortez at his request. He also was present during a pretrial hearing at which Dodson addressed the issue and

38

raised concerns about being subject to "integrity attacks." Gonzalez has not explained, and we do not discern, why his knowledge of and presence at these events was insufficient to protect his rights.

Further, his eventual request to discharge counsel had nothing to do with Dodson's purported conflicts of interest. Rather, Gonzalez complained about the negative comments that he made about Dodson on the jailhouse recordings and expressed concern that "I think she might hold it against me, and so would the jury." Gonzalez, who made the disparaging comments in the first place, cannot plausibly claim he had no knowledge of them until 43 days into the trial. Nor can he claim that a motion made on the eve of trial necessarily would have been timely. "The trial court has discretion to 'deny such a motion if discharge will result in "significant prejudice" to the defendant [citation], or if it is not timely, i.e., if it will result in "disruption of the orderly processes of justice" [citations].' ([*People v. Ortiz* (1990) 51 Cal.3d 975, 983]; see *U.S. v. Gonzalez-Lopez*, [*supra*, 548 U.S.] at p. 152 [a trial court has 'wide latitude in balancing the right to counsel of choice against the needs of fairness' and 'against the demands of its calendar'].)" (*People v. Verdugo*, *supra*, 50 Cal.4th at pp. 310-311.) Our Supreme Court recently held that a motion made six weeks prior to trial may be untimely, where, as here, "the case had been pending for two years," and "Defendant had no substitute counsel in mind." (*People v. Maciel*, *supra*, 57 Cal.4th at pp. 512-513.) Accordingly, we do not conclude that the trial court abused its discretion by deeming untimely a motion made more than a month into trial.

**B.    Prosecutorial Misconduct**

Gonzalez next contends that "numerous instances of prosecutorial misconduct . . . saturated the trial from beginning to end," infecting his trial with such unfairness that the resulting convictions constitute a denial of federal due process.[13] He identifies several

_____

[13] "'Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citation.]" (*People v. Williams* (2013) 56 Cal.4th 630, 671.) To demonstrate error under state law, a defendant must show that ""'it is reasonably probable that a result more favorable to the

instances of alleged misconduct by prosecutor Mokayef, including "withholding information to gain an unfair advantage," "forcing appellant to appear with a shaved head which exposed a tattoo," "asking improper questions" and repeatedly disregarding the court's conduct order. Gonzalez has forfeited many of these claims because he did not raise proper objections at trial. As to the two claims that may be considered on appeal, we conclude that no misconduct occurred.

### 1. Alleged Instances of Misconduct

#### a. Withholding of Information to Gain Unfair Advantage

As discussed above, Dodson orally moved to exclude mention of her name in connection with the transmission of documents to Cortez. Prosecutor Mokayef offered to say that Cortez received the documents from "an attorney," a compromise to which Dodson agreed. Mokayef did not, however, "advise the court defense counsel was named on two of the tapes she intended to play to the jury nor did she redact these references on the tapes or the transcripts for receipt by the jury." Later, when the tapes were played, the court ordered the People to redact several negative comments about Dodson after finding them to be cumulative and prejudicial.

#### b. Head Shaving

On the second day of voir dire, Gonzalez was brought to court with his head shaved. A four- or five-inch tattoo of the word "Hellbound" was visible on the right side of his head. Dodson represented that Gonzalez "didn't choose to have his head shaved" and moved for a continuance based on the prejudice that could result from his appearance before prospective jurors with his head shaved and tattoo visible. DiSabatino and Flanagan joined the motion on the basis of prejudice to their clients, Rangel and Adame. Mokayef opposed the motion, but did not dispute Dodson's representation that sheriffs shaved Gonzalez's head.

---

defendant would have been reached without the misconduct.'" [Citation.]" (*People v. Davis* (2009) 46 Cal.4th 539, 612.) We do not consider whether the alleged misconduct here may have violated state law because Gonzalez does not argue that the alleged prosecutorial misconduct violated any of his rights under state law, or that it is reasonably probable that a different result would have been reached absent the misconduct.

40

The court denied the continuance. It explained that it was bringing jurors in one at a time that day and would ensure that they entered from the other side of the room so as not to see Gonzalez's tattoo. Dodson argued that solution was unsatisfactory because his shaved head alone could cause Gonzalez prejudice. She proposed that Gonzalez waive his appearance until his hair grew out. Mokayef lodged a standing objection on the grounds that "[t]here is no basis for him to waive just because his head was shaved. That request [to shave Gonzalez's head to show his tattoo to the jury] could have been made by the People and definitely granted by the court in this case . . . ." The court accepted Gonzalez's waiver, which included a waiver of "any appealable issue with regards to your presence at this time." Gonzalez did not return to court until January 2, 2013, 11 trial days later.

### c.    Improper Questions

Gonzalez identifies three instances of Mokayef's questioning as improper. The first, "[p]rosecutorial argument masquerading as questions," occurred when Mokayef asked Officer Rodriguez if Alexis Garcia's house was "shot up several times shortly after she testified in this preliminary hearing." Brandt objected to the question on vagueness grounds. Even though the court overruled the objection, Mokayef moved on to another question before Officer Rodriguez could answer. Gonzalez contends that the question was improper "because Mokayef knew at the time she asked the question that one bullet only was found on a ledge of the house," the single record citation he offers does not support that contention. He did not seek an offer of proof or other justification for the query at the time it was posed.

The second "example of questioning not in good faith" to which Gonzalez points is an exchange between Mokayef and Danny Perez. After Perez answered several questions with "I don't remember," Mokayef asked if Perez recalled sitting in the back of the courtroom and speaking with Dodson. When Perez answered yes, Mokayef asked, "What did she tell you?" Perez responded, "About my boob job," and Mokayef followed up with "So did she - - did she tell you to say that you don't remember?" Perez said, "No, she didn't. I'm telling you from myself. That's all I can remember." No counsel

41

objected to any portion of this exchange, and Dodson revisited the topic with Perez during cross-examination.  Gonzalez contends that Mokayef did not have a good faith belief that Dodson coached Perez and was attempting to "malign the integrity of appellant's counsel."

Gonzalez's final example of allegedly improper questioning involves a colloquy through which he contends that Mokayef "[s]muggl[ed] in evidence of an uncharged crime."  We include the challenged exchange[14] with witness Erick Davalos in full:

"[Mokayef]:  After you went to Brotman Hospital and after the next day when you had seen Darky and Darky and defendant Gonzalez got out of the car and you heard shooting - - so after March 24, 2010, did you see defendant Gonzalez again, other than in court? Out on the streets, did you see defendant Gonzalez again?

"[Davalos]:  March 26.

"[Mokayef]:  Okay.  Where did you see him on March 26?

"[Davalos]:  At emergency.

"[Mokayef]:  At a hospital?

"[Davalos]:  Emergency.

"[Mokayef]:  At emergency?

"[Davalos]:  At emergency.

"[Mokayef]:  At the murder scene.[15]

"[Davalos]:  When he killed - - at a murder scene on Pierce and Laurel Canyon. At a murder scene on Pierce and Laurel Canyon.

---

[14] Defendant Adame also challenges the denial of his mistrial motion prompted by this exchange.  (See *post.*)

[15] Two slightly different versions of this exchange appear in the transcript. In the first, which we have included here because it is the contemporaneously recorded rather than read-back version, the record reflects that Mokayef was the first to speak the phrase "at the murder scene."  The second version, which the court read into the record at a 402 hearing on the issue, indicates that Davalos answered Mokayef's question "At emergency?" with "At a murder scene," at which point Mokayef repeated the phrase in the form of a question.

"[Mokayef]: At a murder scene on Pierce and Laurel Canyon? Why do you call that a murder scene?

"Davalos: That's where they killed Sebastian.

"Mokayef: Are you referring to Sebastian Calderon?

"Davalos: Yes.

"Flanagan: Can we approach on this?

"The Court: Yes. Let's approach."

In chambers, Mokayef explained that "Sebastian Calderon is an unsolved murder," a witness who was killed during Mokayef's prosecution of another crime. She claimed that she did not know that Davalos was going to say what he did and "didn't even know he saw Mr. Gonzalez on the 26th." Mokayef further explained that she asked Davalos about Gonzalez's whereabouts to corroborate Estepanie Cortez's expected testimony that Gonzalez and Adame fled to Mexico shortly after the charged incidents. All four defendants moved for a mistrial, which the court denied. The court ordered all counsel to refrain from asking Davalos further questions about March 26, and Mokayef resumed her examination by asking if Davalos knew whether Gonzalez left the country.

Later, at a 402 hearing on the issue, Davalos said he did not know who killed Calderon; he had happened across the scene and observed a "gathering" of people, including Gonzalez, around the body. Defendants again moved for a mistrial, which the court denied. The court explained that a mistrial was not necessary because it struck "the answer" from the record and defense counsel declined the court's invitation to reopen cross-examination of Davalos to clarify that he was not referring to any of the defendants.

The court's striking of the answer occurred at the close of Mokayef's redirect examination of Davalos, 11 transcript pages after the mention of the murder scene. The court admonished: "Before we proceed, ladies and gentlemen, we took a sidebar previously and we came back. I forgot to tell you. The answer the witness gave is stricken from the record, and you are not to consider that. That was the answer given to the last question before we took a sidebar regarding March 26. That's to be disregarded

43

from [*sic*] the jury and stricken from the record." The last answer given was "Yes," to the question, "Are you referring to Sebastian Calderon?"

### d.    Violations of the Court's Conduct Order

Before trial began, the court provided counsel "some rules of conduct for trials for counsel." The order itself is not in the record. Partway through trial, the court admonished all counsel, with the exception of second-chair prosecutor Hilary Williams, for "violat[ing] it to a certain extent, to one degree." At that time, the court reminded counsel to refrain from interrupting one another and making speaking objections of more than one word, and to remember to "be courteous and respectful to one another." Gonzalez contends that Mokayef willfully disobeyed the order on instances "too numerous to recount." He nonetheless offers several examples.

The first cluster of examples involves Mokayef's "attitude" toward the court and other counsel. For instance, after Brandt requested that the court "put teeth" in its conduct order, Mokayef responded, "You can have whatever orders you want. We'll have counsel here say those orders are ridiculous when things are being taken out of order, out of context. There's no order in the world that's going to stop me from making a record." Similarly, during a heated, in-chambers debate over the admissibility of certain statements, Brandt objected that Mokayef "continues to make speaking objections in front of the jury, and they are very emotional." The court responded, "All of you have done that. Stop. That is what I'm telling you. Stop." Mokayef replied, "Your honor, I can't stop. When they come back with a speaking reason, I will not stop." The court reiterated, "No speaking objections. No speaking comments, nothing. We're going to get this trial done. Let's go." In the presence of a juror who was being questioned after apparently falling asleep in court, Mokayef asked the court to "stop interrupting" the juror and told the court that it was "inappropriate" for the court to allow defense counsel to question the juror. Finally, Mokayef accused both Flanagan (outside the presence of the jury) and Dodson (in the presence of the jury) of asking "unethical" questions.

Gonzalez also contends that Mokayef violated the order numerous times by making speaking objections. At least one of the speaking objections interrupted

44

Dodson's recross-examination of a witness.  The final two instances of alleged misconduct involve Mokayef acting "angry" and "derogatory" to witness Abrego, who testified that he was "afraid" of Mokayef, and straying from the lectern during her direct examination of Danny Perez.

### 2.     Applicable Law

"The standards governing review of misconduct claims are settled.  'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'"' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181; see *People v. Cash* (2002) 28 Cal.4th 703, 733.) . . . .  "'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.'  [Citation.]" (*People v. Williams*, *supra*, 56 Cal.4th at p. 671.)  Failure to object also may be excused if an objection would be futile.  (*People v. Clark* (2011) 52 Cal.4th 856, 960.)

### 3.     Analysis

#### a.     Most of Gonzalez's claims are forfeited

The People contend that Gonzalez failed to preserve his prosecutorial misconduct claims for review by failing to object at trial to virtually all of the conduct he now challenges.  Gonzalez retorts that "[t]o the extent that any assignment of prosecutorial misconduct is deemed waived or forfeit[ed] on review under *People v. Clark*[, *supra*,] 52 Cal.4th [at p.] 960, it serves as another example of Dodson's failure to act as a diligent advocate on behalf of her client due to her conflicting interests."  He also suggests that an objection would have been futile in the context of Mokayef's allegedly "contemptuous" remark that "There is no order in the world that's going to stop me from making a record" and her "continued use of speaking objections."

We agree with the People that Gonzalez has forfeited most, if not all, of his prosecutorial misconduct claims by failing to object and seek admonitions with regard to Mokayef's comments and conduct at trial.  The only cited incidents to which Dodson

45

raised any objection were the head shaving and Davalos's testimony about the Sebastian Calderon murder. In both instances, she argued only that Gonzalez was unfairly prejudiced. Despite her failure to object on the precise grounds raised here, we nonetheless will reach the merits of these two claims in light of Dodson's "substantial compliance" with the preservation rule. (*People v. Bonin* (1988) 46 Cal.3d 659, 689, overruled in part on other grounds by *People v. Hill* (1998) 17 Cal.4th 800, 823 fn.1.) No magic words are required to preserve the objection for appellate review (*People v. Ward* (2009) 173 Cal.App.4th 1518, 1527-1528), and Dodson's efforts to obtain a continuance (in connection with the head shaving) and a mistrial (in connection with the Calderon questioning) gave the court "more than ample opportunity" to correct the alleged harm to her client. (*People v. Bonin*, *supra*, 46 Cal.3d at p. 689.) Gonzalez's challenges to the other incidents are forfeited, however.

We are not persuaded by Gonzalez's unsupported suggestion that Dodson's failure to object stemmed from her alleged conflicts, nor are we convinced that it constitutes further evidence of her inefficacy. "Attorneys are not required to make every conceivable objection. Litigation is a series of tactical choices about which there are no absolute rules." (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 394-395.) Dodson (and the other defense counsel) may well have decided that it was not in her client's best interest for her to continually object to Mokayef's behavior, particularly where the court observed that all counsel except Mokayef's co-prosecutor engaged in improper conduct at some point during the months-long trial.

That said, the record does not support Gonzalez's contention that objections to Mokayef's speaking objections and defiant comment would have been futile. The court admonished Mokayef and defense counsel alike for violating the conduct order,[16] and

<hr />

[16] The court did not admonish Mokayef when she told the court in chambers, "You can't tell me what to do," and stated, "Just because somebody is wearing a robe doesn't mean they can tell people everything." Gonzalez did not identify these comments as potential misconduct, so we do not consider them here. We note only (1) that prosecutors, like all counsel, "owe[] a duty of respect for the court" (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1374), (2) that "bickering with the court" generally is

46

there is nothing in the record to suggest that the court would have declined a request to do so at the identified junctures.

### b. The head-shaving incident cannot be attributed to the prosecution

We need not decide whether Gonzalez waived his right to challenge the head-shaving incident by executing a written waiver of his right to appear during jury selection, because his claim of prosecutorial misconduct cannot succeed even if it is not waived. Gonzalez contends that "[t]he only reasonable inference from the record was rather than asking for a court order, Ms. Mokayef directed the sheriff to shave appellant's head," thereby causing his absence "from a critical stage of the trial." He further asserts that "[t]here was absolutely no reason for the sheriff's department to do this on its own," that "[s]omeone told sheriffs just what was needed to be exposed and where it was," and that his head was shaved "for the purpose of exposing a gang tattoo to jurors." These speculative contentions cannot carry the day.

Nothing in the record suggests, even inferentially, that Mokayef (or co-prosecutor Williams) directed the sheriff's department to shave Gonzalez's head.[17] The absence of a link between the prosecutors and the challenged conduct is fatal to Gonzalez's claim. "Absent some additional showing of affirmative prosecutorial involvement in [the head shaving], we cannot hold the prosecutor legally responsible merely because a sheriff's deputy working at the jail was involved." (*People v. Jacinto* (2010) 49 Cal.4th 263, 270-271.) As far as we can discern from the record, "'[t]he sheriff's department was no more than the custodian of [defendant Gonzalez.] In this case, it was not part of the prosecutorial investigative team . . . [and] the action of the sheriff's department or county

---

frowned upon (*ibid.*), and (3) that Judge Lyons's decision to "sit above the fray" (*ibid.*) by overlooking this and the numerous other "such excesses of zeal [from all counsel] which do not seriously disrupt the proceedings" (*Smith v. Superior Court of Los Angeles County* (1968) 68 Cal.2d 547, 558) is indicative of good judicial temperament. (*Id.*; *People v. Pigage*, *supra*, 112 Cal.App.4th at p. 1374-1375.)

[17] The trial court stated that it intended to "look into" the circumstances of the head-shaving by ordering a report from the sheriff's department. The record does not reflect whether any such report was ordered or, if it was, what it showed.

jail may not be attributed to the prosecution.'" (*Id.* at p. 271.) Accordingly, we conclude that the head-shaving incident did not constitute prosecutorial misconduct.

### c. The testimony about the Calderon murder was not the result of improper questioning

Gonzalez contends that Mokayef "elicited testimony that appellant was involved in another, but uncharged, murder" by asking "improper questions of Davalos." Although we are troubled by Davalos's testimony, we are not persuaded on the record before us that it is attributable to improper questioning by Mokayef.

"""It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' [Citations.]" [Citation.] Such misconduct is exacerbated if the prosecutor continues to elicit such evidence after defense counsel has objected.' (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) However, a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated. (*People v. Valdez* (2004) 32 Cal.4th 73, 125.)" (*People v. Tully* (2012) 54 Cal.4th 952, 1035; see also *People v. Harris* (2005) 37 Cal.4th 310, 344 ["offering evidence the prosecutor *knows* is inadmissible may be misconduct"].)

Here, there is no indication that Mokayef intentionally elicited the testimony that "they" were involved in another murder. Mokayef informed the court in chambers that she "didn't know he was going to say that" and did not even know that Davalos, who had not been interviewed by police in connection with the Calderon murder, was present at the Calderon murder scene. After Flanagan called the veracity of Mokayef's explanation into doubt, Mokayef further clarified, consistently, that she had been attempting to elicit testimony regarding Gonzalez's flight to Mexico so as to generally corroborate Davalos, a potential accomplice to the charged crimes. The trial court appears to have credited Mokayef's explanation; it noted particularly that Mokayef did not ask Davalos about a specific date when she initiated the line of questioning. We further note that Mokayef's repetition of "emergency" and query as to why Davalos referred to Pierce and Laurel

48

Canyon as a "murder scene" lend credence to her profession of ignorance as to what Davalos would say.[18]

Gonzalez acknowledges Mokayef's explanations, which were made in her capacity as an officer of the court, but, like Flanagan did at trial, suggests they were disingenuous. The mere suggestion of impropriety, however, does little to refute the record evidence that Mokayef did not anticipate or affirmatively solicit the contested testimony. Mokayef complied with the court's order to refrain from further discussing the Calderon murder with Davalos or any other witness, and did not raise the matter during argument, which further demonstrates that she was not attempting to "smuggl[e] in" inadmissible evidence or prejudice defendants.

Gonzalez also contends that the trial court was ineffective at remedying any prejudice that may have stemmed from Davalos's testimony. We disagree. The trial court promptly held an in-chambers conference about the testimony, at which it prohibited all counsel from further mentioning any murders aside from those charged. The court subsequently instructed the jury not to consider and struck from the record what it appeared to believe was the offending testimony. Although both Gonzalez and Adame now contend, rightly, that the court failed to strike the most troubling portion of Davalos's testimony, neither one of them (or any of the other defendants) objected to, sought clarification of, or proposed an alternative to the court's curative admonishment at trial. Nor did they accept the court's invitation to reopen cross-examination of Davalos after the 402 hearing. They accordingly have forfeited any claim of error stemming from the court's curative efforts.

---

[18] The record reflects that the court and counsel had difficulty hearing and understanding Davalos throughout his testimony because he was chewing gum, speaking softly, and not speaking into the microphone. This further suggests that Mokayef's repetition of "emergency" and ultimate mention of "murder scene" were not contrivances or machinations but rather genuine indications of an inability to hear or understand Davalos.

### C. Judicial Error

Gonzalez's final argument is that "judicial error in evidentiary rulings and the trial court's failure to take control of the proceedings to prevent jurors from being exposed to highly prejudicial matter" denied him the fair trial to which he is entitled under the United States Constitution. We are not persuaded that any of the incidents Gonzalez identifies, individually or cumulatively, constituted judicial misconduct or deprived him of a fair trial.

#### 1. Alleged Judicial Errors

##### a. Denial of Continuance based on Head Shaving

As described above, Gonzalez came to court on the second day of voir dire with his head shaved and a large tattoo of the word "Hellbound" exposed. The court denied his motion to continue on the grounds that Gonzalez would not be prejudiced because the potential jurors would not be able to see the tattoo. Gonzalez asserts this is not a "valid reason for denying the motion to continue." He subsequently executed a waiver of his right to be present for jury selection, which he claims he was forced to do to prevent the violation of his Fourteenth Amendment right to appear before the jury in civilian attire.

##### b. Denial of Mistrial based on "Taxes" Testimony

During the voir dire of potential alternate jurors, in front of the seated jurors, prospective juror No. 26 informed the court that he was "extremely biased against defense attorneys and any defense witnesses" because he had a negative experience as a juror in 1989. Prospective juror No. 26 explained that the defense attorney at the previous trial was indicted by a grand jury for his actions during the trial. The defense attorney was convicted and sentenced to three years in prison, although his conviction was overturned on appeal. Prospective juror No. 26 nonetheless viewed that attorney as a "one-man crime wave" and stated that he could not be fair to the defense attorneys in the instant case because he thought "they will try to pull something over on me" even though he had not "made a connection between" the other attorney and defense counsel in this case. All counsel stipulated to excuse prospective juror no. 26 for cause.

Two days later, the People asked their first witness, gang expert Officer Rodolfo Rodriguez, to "tell the ladies and gentlemen of the jury a little bit about the concept of taxes and taxing with respect to gang culture." Officer Rodriguez testified that "taxing is basically charging rent for allowing a person to sell narcotics." He further stated that the "tax" proceeds are placed into gangs' general funds, which are used "to pay for defense attorneys, things of that nature, buy guns, buy more narcotics, and then to party with."

Adame's counsel, Flanagan, moved for a mistrial on the grounds that Officer Rodriguez's testimony had "besmirched" the integrity of defense counsel, whose character already had been impugned by prospective juror no. 26. Counsel for the other three defendants joined Flanagan's motion. Flanagan, Brandt, and DiSabatino indicated that they had never, in their many years of experience as criminal defense attorneys, heard a gang expert say that "tax" revenue is used to pay defense counsel.

The court denied the motion for mistrial on the grounds that it stopped questioning prospective juror no. 26 to avoid "tainting and poisoning the veneer [*sic*]." It also held an Evidence Code section 402 hearing to "inquire into the statement that the officer made in open court." Officer Rodriguez testified at that hearing that "maybe five" gang members he had spoken to "probably in 2006" had told him that taxes are used to pay for defense attorneys. He did not have documentation and refused to disclose the names of the informants. The court denied defendants' renewed motion for mistrial at the close of the 402 hearing.

### c. Inadequate Courtroom Security

During the second week of testimony, six jurors and one alternate juror expressed concern that a male spectator wearing a Pittsburgh Steelers hat may have been taking photographs with an iPhone during trial. The court indicated that it remembered seeing the spectator with the phone but did not see him point it toward the jurors or anywhere else in the courtroom. The court stated that it was "super sensitive" to the jurors' concerns and informed the jurors that it was going to order the matter investigated.

At Mokayef's request, the court asked the affected jurors "whether, despite what happened, can you put that aside and continue to be objective and keep an open mind and

51

be fair in this case?"  All of them responded affirmatively.  Because the affected jurors also indicated that they had discussed the matter with the other members of the jury, the court posed substantively the same question to the remaining jurors and alternates.  All of them stated they could continue to be fair.

Flanagan reserved and subsequently made a motion for mistrial, which counsel for all defendants joined.  He argued that, based on the expert's testimony and the spectator's Steelers hat, the jurors may have concluded that the spectator was a gang member and out of fear would be unable to remain impartial.  The court denied the motion.

### d.     Biased Enforcement of Courtroom Rules

Gonzalez contends that the court "broke its own rules" by permitting Mokayef to make speaking objections, overruling Dodson's objections to the jailhouse recordings, and making other unspecified "one sided rulings against the defense."  "Whether labeled prosecutorial misconduct or judicial error or the combination of the two," Gonzalez contends, the court's behavior denied him a fair trial.

### 2.     Analysis

### a.     The court properly denied the motion for continuance

"'A continuance in a criminal trial may only be granted for good cause.  [Citation.] "The trial court's denial of a motion for continuance is reviewed for abuse of discretion." [Citation.]  "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."  [Citations.]'  (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.) 'The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.]  [¶]  Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered.  [Citations.]'  (*People v. Beames* (2007) 40 Cal.4th 907, 920.)"  (*People v. Hajek* (2014) 58 Cal.4th 1144, 1181.)

We find no abuse of discretion in the court's refusal to grant a continuance to allow Gonzalez's hair to grow out. The court stated that it would "do whatever is possible to prevent the jurors from seeing the defendant's side of the - - where the tattoo is located." The court thus implicitly concluded that the mitigated risk of prejudice to Gonzalez was outweighed by the detriments associated with certain delay that would affect all participants in the trial if a continuance were granted. The court's balancing of these competing interests was reasonable and well within its discretion, particularly since there was no evidence that the People were responsible for the head-shaving and the People eventually introduced a photograph of Gonzalez's tattoo without objection.

We also reject Gonzalez's contention that the court erred by forcing him into the unenviable dilemma of waiving one constitutional right to protect another. First, it is not clear that Gonzalez had a constitutional right to attend court wearing a particular hairstyle. Though it is well-established that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes" (*Estelle v. Williams* (1976) 425 U.S. 501, 512), Gonzalez has not pointed to a single case holding that a defendant may not be compelled to stand trial with a shaved head. A shaved or bald head – particularly when the tattoos it displays are concealed from the jury – is not itself a badge of custody, gang membership, or guilt. Second, even if there were such a right, it was waivable (*People v. Taylor* (1982) 31 Cal.3d 488, 495) and was waived in this case. Gonzalez signed a written waiver of his right to appear for jury selection and to appeal that waiver, in compliance with section 977, subdivision (b), and the court engaged him in a colloquy before accepting the waiver. There is no evidence that the court forced or even encouraged Gonzalez to waive his appearance, or that the waiver was made involuntarily. Third, contrary to Gonzalez's suggestion, the court did not condition his waiver upon "waiver of appealing the trial court's decision to continue the case." The court expressly informed Gonzalez that his right to appeal the waiver of appearance—which he also waived—was "a different issue" from his right to appeal the denial of his motion to continue and/or "quash the veneer [*sic*]," which properly was preserved.

53

**b.      The "taxes" testimony did not require a mistrial**

"""""A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. . . ." [Citation.] A motion for a mistrial should be granted when """a [defendant's] chances of receiving a fair trial have been irreparably damaged.""""" [Citation.] 'Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice.' [Citation.]" (*People v. Dement* (2011) 53 Cal.4th 1, 39-40.)

The trial court did not abuse its discretion or otherwise err in denying the motion for mistrial based on Officer Rodriguez's "taxes" comment. The testimony did not, as Gonzalez and Adame suggest, "[c]om[e] almost immediately after Juror no. 26's degrading statements about defense attorneys." Prospective juror no. 26's "diatribe" occurred on the morning of January 7, 2013, two full days before Officer Rodriguez's testimony on the morning of January 9, 2013. Even if these statements about defense attorneys had been closer in time to one another, there is no indication that the statements, separately or together, so impugned defense counsel's integrity as to irreparably damage defendants' chances of receiving a fair trial. Prospective juror no. 26's inflammatory statements were not evidence as defined by the court's instructions to the jury, and we accordingly presume the jury did not consider them when determining defendants' guilt. (*People v. Jackson* (2014) 58 Cal.4th 724, 767.) We also cannot conclude that any minimal prejudice to defendants resulting from those statements or Officer Rodriguez's testimony was so "incurable" as to warrant a mistrial. Officer Rodriguez's testimony about taxes did not explicitly impugn the integrity of the defense attorneys in this case. To the contrary, Officer Rodriguez testified at least twice that he had no knowledge that these particular attorneys were paid with "tax" money. This testimony, as Flanagan acknowledged during trial, mitigated the risk of the jury drawing a prejudicial inference from his earlier, more general testimony.

54

We similarly conclude that the court did not err in denying attorney Brandt's motion to strike the testimony from the record as irrelevant. Officer Rodriguez's testimony about gangs' collection of "taxes" in connection with narcotics sales was relevant to the People's suggested motive for the March 23, 2010 shooting incident: that the victims were attacked because they "owed" or "shorted" defendants. "Evidence that 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive' is generally admissible" (*People v. Riccardi* (2012) 54 Cal.4th 758, 815), and the background evidence concerning "taxes" is no exception. The court accordingly did not err in declining to strike the testimony from the record.

### c. Courtroom security was not inadequate

Gonzalez contends that the court erred by not implementing measures to ensure that devices capable of photography were not taken into the courtroom. We disagree. "In general, the 'court has broad power to maintain courtroom security and orderly proceedings' [Citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.]" (*People v. Lomax* (2010) 49 Cal.4th 530, 558.) We discern no abuse of discretion in the court's approach to courtroom security. The court established rules for all spectators, including "do not intimidate or attempt to intimidate any witness or juror," and "maintain respect for the court and observe the dignity of the courtroom." The bailiffs were to provide the rules to spectators, whose names would be recorded under seal. The record reflects that the court enforced these rules throughout the trial. The fact that one spectator may have circumvented the rules by bringing in an iPhone and possibly taking photographs does not establish that the court's efforts at maintaining courtroom security were not "reasonably prudent," nor that the court should have "stationed" a bailiff "outside the courtroom with spectators standing in a line, having their I.D. checked and noted, each being told to keep their cell phones in their pockets otherwise they will be seized and not returned, and that they were to remove all hats or caps with no insignia exposed before entering the courtroom." No security measure is 100 percent foolproof, and the ubiquity of cell phone use in today's society leaves us skeptical that even Gonzalez's proposed protocol successfully would have prevented the

55

alleged spectator misconduct at issue.  The court's efforts to balance the witnesses' and jurors' interests in security against the public's right to attend a trial were reasonable under the circumstances.

So too was the court's handling of the jurors' concerns about the rogue spectator. The court took the jurors' concerns under consideration as soon as they were raised and indicated that it would take steps to investigate the matter.  (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1089 & fn. 24.)  The court's prompt intervention appears to have allayed the jurors' concerns about their safety.  The court also responded to defendants' concerns about prejudice: it asked all of the jurors whether they could remain objective and fair.  All of the jurors responded affirmatively.  The trial court found these representations satisfactory, and so do we.  "'[W]e cannot, as a general matter, simply disregard a juror's own assurances of his impartiality based on a cynical view of 'the human propensity for self-justification.'  [Citation.]'" (*People v. Rountree* (2013) 56 Cal.4th 823, 841.)  Gonzalez has not identified any reason for us to doubt the veracity of the jurors' representations to the court, and we decline his invitation to conclude that the jurors "assumed that the person was not caught as they listened to a case involving gang violence and witness intimidation."  We credit the jurors' assurances of impartiality and conclude that the spectator issue did not cloud their perception of the evidence or foster an unduly prejudicial "atmosphere of fear."

### d.     The court did not exhibit bias against Gonzalez

Like all criminal defendants, Gonzalez had a due process right to an impartial judge under the state and federal Constitutions.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, disapproved on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "The due process clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case."  (*Guerra* at p. 1111.)  "Mere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias."  (*Ibid.*)  Similarly, "a trial court's numerous rulings against a party – even when erroneous – do not establish a charge of judicial bias, especially when they are

56

subject to review." (*Id.* at p. 1112.) To demonstrate that a judge "has manifested bias in the presentation of evidence," a defendant must show that the judge "''officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that [s]he [was] allying [her]self with the prosecution.'" [Citation.]" (*People v. Harris*, *supra*, 37 Cal.4th at p. 347.) Our role "'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial. [Citation.]'" (*Ibid.*) To preserve the issue for review, a defendant must object to the alleged instances of bias or seek a jury admonition regarding the alleged judicial intemperance. (*People v. Snow* (2003) 30 Cal.4th 43, 78.)

Here, we need not decide whether Gonzalez properly preserved his claim of judicial bias because the record does not reflect that the judge was biased against him or any of the other defendants. Although it is true that the court on occasion refrained from reprimanding Mokayef for making speaking objections or otherwise deviating from its conduct order, Gonzalez neglects to note instances in which the court overlooked similar transgressions by defense counsel. Just as a numerical tally of objections sustained or overruled that favors one party does not itself establish bias (*United States v. Pisani* (2d Cir. 1985) 773 F.2d 397, 402), a simple numerical tally of reprimands during the course of a months-long trial is not alone indicative of bias. In any event, "manifestations of friction between court and counsel, while not desirable, are virtually inevitable in a long trial" (*People v. Snow*, *supra*, 30 Cal.4th at pp. 78-79), and the court's occasional admonishments of counsel strike us as par for the course.

We also find wanting Gonzalez's contention that the court was biased in its evidentiary rulings regarding the jailhouse recordings. Although the court overruled several of Dodson's objections to the tapes, it granted her request to prohibit mention of her name in connection with the delivery of documents to Cortez, and also required the People to redact certain derogatory statements contained in the recordings. Examined as a whole rather than in piecemeal fashion, the court's evidentiary rulings regarding the

57

tapes appear evenhanded. We also note that the court's willingness to entertain Dodson's objections during the playing of the tapes despite its numerous reminders that these sorts of objections should have been made earlier further negates the suggestion that the judge was "allying [her]self with the prosecution." (*People v. Harris*, *supra*, 37 Cal.4th at p. 347.)

## II. Defendant Adame

Defendant Adame challenges both his convictions and his sentence. As to the former, Adame contends that all of his convictions should be reversed because the court's denial of his mistrial motions deprived him of a fair trial. He also specifically challenges his conviction for the attempted murder of Miguel Castro (count 4) on the grounds that the court incorrectly instructed the jury that he could be convicted based upon Gonzalez's intent to kill everyone within Abrego's "kill zone." As to his sentence, Adame argues that the trial court improperly imposed multiple enhancements for the same firearm use and infliction of great bodily injury, and that the abstract of judgment must be corrected to conform to the trial court's oral pronouncement of sentence. For the reasons explained below, we affirm Adame's convictions, as well as the trial court's imposition of sentence enhancements. We agree with Adame (and the People) however, that the abstract of judgment deviates from the trial court's oral pronouncement of judgment and accordingly direct the trial court to correct the abstract of judgment by ordering the enhancements imposed pursuant to section 12022.53, subdivision (d), on counts 2 and 3 stayed.

### A. The trial court did not abuse its discretion by denying Adame's mistrial motions

Like Gonzalez, Adame contends that he was incurably prejudiced by the volunteered testimony of two witnesses: Officer Rodriguez, who testified that gangs use "taxes" to pay for defense attorneys (see *ante*, Discussion, subd. (I)(C)(1)(b)), and Erick Davalos, who testified that "they killed Sebastian." (See *ante*, Discussion, subd. (I)(C)(1)(b).) Adame moved for mistrial in connection with both of these incidents, but the trial court denied his motions. He now argues that the trial court abused its discretion

58

when it denied his mistrial motions and that he was prejudiced and deprived a fair trial as a result. We find no abuse of discretion and affirm.

As we explained above "'"[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. . . ." [Citation.] A motion for a mistrial should be granted when "'"a [defendant's] chances of receiving a fair trial have been irreparably damaged."'"' [Citation.] 'Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice.' [Citation.]" (*People v. Dement*, *supra*, 53 Cal.4th at pp. 39-40.)

For the same reasons discussed above (*ante*, Discussion, subd. (I)(C)(2)(b)), we conclude that the trial court did not abuse its discretion by denying the mistrial motion made in connection with the "taxes" testimony.

We likewise conclude that the trial court did not abuse its discretion by denying Adame's mistrial motion made in connection with the testimony about the Sebastian Calderon murder scene. We adopt and reiterate here our previous discussion concerning the Calderon murder testimony (*ante*, Discussion, subd. (I)(B)(3)(c)), in particular our observation that Adame did not object to, seek clarification of, or propose an alternative to what he now contends was a faulty and ineffectual curative instruction by the trial court. As Adame acknowledges, curative instructions to disregard improper testimony ordinarily are sufficient to protect defendants from the injury associated with the admission of such testimony (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 834), and we are not convinced that the testimony about the Calderon murder scene, which did not directly refer to or inculpate Adame, warrants an exception to this general rule. Nor are we persuaded that the jury "would naturally suspect" from Davalos's vague statement, which was prompted by a query about *Gonzalez's* whereabouts, that Adame was "in some way responsible for the murder on March 26, 2010." Adame is correct that the evidence at trial showed that he and Gonzalez "repeatedly committed murder" or at least

59

attempted to do so—indeed, it is the overwhelming nature of the evidence against him that undermines his claim of irreparable prejudice—but the jury also heard evidence that Gonzalez acted alone in shooting Edwin Henriquez. Adame was not an omnipresent participant in Gonzalez's crime spree. Moreover, Adame learned at sidebar that Davalos did not see him "at the murder scene," but elected not to apprise the jury of that information. In light of all of these circumstances, it was not an abuse of discretion for the court to deny Adame's mistrial motion.

**B.     The challenge to CALCRIM No. 600 is forfeited and would not be successful if properly preserved**

Adame next contends that the trial court incorrectly instructed the jury with a modified version of CALCRIM No. 600 such that he may have been found guilty of the attempted murder of Miguel Castro (count 4) based upon Gonzalez's intent rather than his own. We disagree and affirm his conviction on count 4.

**1.     Background**

In count 4 of the information, Adame and the other defendants were charged with the attempted premeditated murder of Miguel Castro, who drove Sergio Abrego to meet "Whisper" in the early hours of March 16, 2010. The People conceded at trial that "it would be a far stretch" for them to argue that defendants set out with the explicit intention to kill or injure Castro. Instead, they sought to convict defendants under the "kill zone" theory, which "applies when the defendant chooses, *as a means of killing a targeted individual*, to kill everyone in the area in which the targeted individual is located." (*People v. McCloud* (2012) 211 Cal.App.4th 788, 802 fn. 6 [emphasis in original].) The People thus accurately characterized the kill zone theory in their closing argument when they told the jury that defendants "knew Sergio Abrego, they wanted to kill Sergio Abrego; and they were going to take him out, no matter how or who was with him." (See *People v. Bland* (2002) 28 Cal.4th 313, 329-330.) The People also argued in closing that "all four of them intended to kill" Abrego, but, even if a particular defendant lacked the requisite specific intent, "the fact that they were aiding and abetting derived the perpetrators' intent." None of the defendants objected to these arguments.

60

Nor did any of the defendants object to the court's instructions on aiding and abetting (CALCRIM Nos. 400, 401, and 403), or the specific instruction Adame challenges here, a modified version of CALCRIM No. 600 which included a discussion of the kill zone theory[19] and read, in pertinent part, "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict a [*sic*] defendants Gonzalez, Adame, Rodriguez and Rangel, of the Attempted Murder of Sergio Abrego as charged in Count 2 and of Attempted Murder of Miguel Angel Castro, as charged in Count 4, the People must prove that the defendants *or a principal*, not only intended kill to [*sic*] Sergio Abrego, but also either intended to kill Miguel Angel Castro as charged in Count 4, or that the defendants *or a principal*, intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendants [*sic*] intended to kill Sergio Abrego and Miguel Angel Castro by killing everyone in the kill zone, then you must find the defendant not guilty of the Attempted Murder of Sergio Abrego and of the Attempted Murder of Miguel Angel Castro." Notably, the court sua sponte raised the issue of whether it was appropriate to modify the instruction by adding the phrase "or a principal," and the People argued that it was, "because we're going on the aiding and abetting theory on that." None of the defendants raised any objection to the People's added language or more generally to the concurrent use of the aiding and abetting and kill zone theories.

---

[19] The Supreme Court has explained that the kill zone theory "is not a legal doctrine requiring special jury instructions," but rather is "simply a reasonable inference the jury may draw in a given case." (*People v. Bland*, *supra*, 28 Cal.4th at p. 331 fn. 6; see also *People v. Stone* (2009) 46 Cal.4th 131, 137-138; *People v. Smith* (2005) 37 Cal.4th 733, 746.) Consequently, it is "*impossible* for a trial court to commit error, much less prejudicial error, by declining to give a kill zone instruction." (*People v. McCloud*, *supra*, 211 Cal.App.4th at p. 803 [emphasis in original].) It is possible, however, for a trial court to err by delivering a kill zone instruction; Division 1 of this District recently held that a trial court committed prejudicial error by delivering the CALJIC instruction on the kill zone theory, CALJIC No. 8.66.1. (*People v. Sek* (2015) 235 Cal.App.4th 1388.)

Adame now claims, however, that the modified instruction "could reasonably be interpreted by the jury to authorize appellant's conviction of the attempted murder of Castro based upon the intent of Gonzalez, who was another 'principal' in the shooting at Canterbury and Fillmore [*sic*]." Adame does not broadly challenge the People's concurrent use of both the aiding and abetting and kill zone theories; to the contrary, he suggests that it was proper for the jury to find that Rodriguez and Rangel derived their intent to kill Castro from Gonzalez.[20] The problem in his view stems from the instruction's "failure to make it clear that the language concerning a principal's intent to kill everyone within a kill zone applies only to a defendant who is an aider and abettor," a category into which he claims he does not fall because the People did not expressly characterize him as an aider or abettor.

### 2. Analysis

The People contend that Adame's challenge to the modification of CALCRIM No. 600 is forfeited because he did not request a clarification instruction. "'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) Given Adame's concession that the instruction was proper as to Rodriguez and Rangel and his argument that the court merely failed "to *make it clear* that the language concerning a principal's intent to kill everyone within a kill zone applies only to a defendant who is an aider and abettor," we agree that the challenge is forfeited.

Adame urges that his challenge is exempt from this general rule because the instruction incorrectly stated the law (*People v. Hudson*, *supra*, 38 Cal.4th at p. 1012) and failed to adequately apprise the jury of all elements of the charged offense (*People v. Flood* (1998) 18 Cal.4th 470, 481). We are not persuaded. The court instructed the jury

---

[20] Rodriguez and Rangel do not dispute this suggestion or otherwise challenge their convictions on Count 4 on this basis. The People likewise appear to assume – and indeed, argued at trial – that "aider and abettor and kill zone work[] together." We accordingly are not presented with a challenge to and do not consider the correctness of this fundamental premise.

that the People had to prove that "[t]he defendant took at least one direct but ineffective step toward killing another person" and that "[t]he defendant intended to kill that person" to prove the defendants guilty of attempted murder. (CALCRIM No. 600.) The jury thus correctly was apprised of the elements of the charged crime (*People v. Houston* (2012) 54 Cal.4th 1186, 1217) – and we note that neither Adame nor any of the other defendants contend that the instruction was improper as to the other seven counts of attempted murder. The court also accurately instructed the jury on the principles of aiding and abetting liability. (*People v. Smith* (2014) 60 Cal.4th 603, 616; CALCRIM Nos. 400, 401).

Adame acknowledges, and we agree, that "[t]he jurors were not limited to the prosecutor's theories but were free to determine themselves how the instructions applied to the evidence and, in fact, had a duty to so." "It is elementary . . . that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) "'The jury should not be constrained by the fact that the prosecution and the defense have chosen to focus on certain theories.' [Citation.]" (*People v. Barton* (1995) 12 Cal.4th 186, 203.) Applying these principles, we do not see how the People's failure to focus their aiding and abetting argument specifically on Adame rendered that instruction or the instructions as a whole (*People v. Lucas* (2014) 60 Cal.4th 153, 282, 287, disapproved by *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19) incorrect or inadequate. In other words, the jurors were free to apply what the parties agree was a legally correct theory (aiding and abetting) when considering Adame's guilt, if the evidence warranted it. The evidence here did warrant it. The evidence showed Adame was the driver of a vehicle from which a barrage of gunshots was fired at a van containing a rival gang member lured to the scene. Even if, as Adame claims, "he was occupied with driving the vehicle and therefore likely fired fewer gunshots than Gonzalez," and thus "fired his gun at only Abrego and did not try to kill everyone in the van occupied by Abrego," the evidence amply supports the conclusion that Adame was fully aware of what Gonzalez was doing and aided as Gonzalez riddled Abrego's van with "a flurry of bullets"

demonstrative of a concurrent intent to kill everyone inside it.  (*People v. Bland*, *supra*, 28 Cal.4th at pp. 330-331; *People v. Carrasco* (2014) 59 Cal.4th 924, 968-969 [discussing aiding and abetting liability].)

Moreover, the purported instructional error was harmless, even if it did omit or misdescribe an element of the charged offense.  (See *People v. Flood*, *supra*, 18 Cal.4th at pp. 487, 490 [misdirection of the jury], including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error, are reviewed under the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Mil* (2012) 53 Cal.4th 400, 409 [test articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 applies if jury instructions omit an essential element of the offense].)  The evidence overwhelmingly supported a finding that Adame himself harbored the specific intent to kill everyone in Abrego's van, which is underscored by the jury's finding that Adame committed the attempted murder at issue "willfully, deliberately and with premeditation."  Adame does not dispute that he drove to a designated meeting with a rival gang member, and personally shot large caliber bullets at the gang member's van at close range, eventually rendering the van disabled.  (See *People v. Smith*, *supra*, 37 Cal.4th at p. 743 ["evidence that defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both"].)

## C.    The court properly imposed and stayed enhancements for firearm use and great bodily injury on counts 11-15

Adame next argues that the trial court should not have imposed and stayed the sentencing enhancement for great bodily injury (§ 12022.7, subd.(a))  on counts 11, 12, and 14, or the sentencing enhancement for the use of a firearm (§ 12022.5) on counts 13 and 15.  Citing *People v. Rodriguez* (2009) 47 Cal.4th 501, 508-509 (*Rodriguez*), and *People v. Gonzalez* (2009) 178 Cal.App.4th 1325, 1332, Adame contends that the court violated section 1170, subdivisions (f) and (g) by double counting the enhancements: using them once to render his convictions on counts 11-15 (§ 245, subd. (b)) "violent

felonies" for purposes of section 186.22, subd. (b)(1)(C), and then using the enhancements a second time to further enhance his punishment. He argues that section 1170.1, subdivisions (f) and (g) authorized the court to impose "only the greatest" of the applicable enhancements, which in this case was the ten-year enhancement for committing a violent felony for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). For the reasons that we explain below, we conclude that section 1170.1, subdivisions (f) and (g) prohibit imposing and *executing* duplicative sentence enhancements based on firearm use or great bodily injury. Here, the court imposed and *stayed* the contested enhancements and accordingly did not violate section 1170.1, subdivisions (f) and (g).

### 1. Background

In counts 11-15, Adame was charged with assault with a semiautomatic firearm (§ 245, subd. (b)) in connection with the March 23, 2010 shootings near Pinney Street and Pala Avenue. The jury returned a guilty verdict on all five of these counts. The jury also found true for all five counts the special allegations that Adame personally used a firearm within the meaning of section 12022.5, subdivisions (a) and (d), and committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(C). With respect to counts 11, 12, and 14, the jury also found true the special allegation that Adame personally inflicted great bodily injury upon those counts' victims within the meaning of section 12022.7, subdivision (a). After the jury trial, the court found that Adame suffered a prior strike conviction.

The trial court sentenced Adame identically on counts 11, 12, and 14. The trial court imposed a base term of 12 years for each count, derived by imposing the midterm of six years and doubling it due to Adame's prior strike conviction. The court imposed an additional and consecutive midterm sentence of six years on each of these counts for Adame's personal use of a firearm (§ 12022.5, subds. (a), (d)), an additional and consecutive term of 10 years for the gang allegation "since the offense, Penal Code

65

section 245(b), is a violent felony due to the great bodily injury enhancement" (§ 186.22, subd. (b)(1)(C)), and then imposed and stayed the three-year enhancement for great bodily injury (§ 12022.7, subd. (a)) "pursuant to Penal Code section 1170.1(g), which prohibits multiple use of the same enhancements." Thus, Adame received a total of 28 years on each of counts 11, 12, and 14, plus an additional three years from the great bodily injury enhancement that were stayed. The court stayed the sentences on counts 11, 12, and 14 pursuant to section 654, "pending the finality of the service of the sentence for each of the counts which named the same victim."

The court imposed aggregate sentences of 22 years on each of counts 13 and 15. The court imposed and doubled the midterm of six years, for a 12-year base term on each of these counts. To each 12-year base sentence, the court added an additional and consecutive term of 10 years for the gang allegation (§ 186.22, subd. (b)(1)(C)) "since the offense is a violent felony, due to the firearm enhancement under Penal Code section 12022.5." The court then imposed and stayed an additional and consecutive midterm of six years for Adame's use of a semiautomatic firearm (§ 12022.5), noting that "[t]he firearm enhancements cannot be used twice under the limitation of multiple use of enhancements." The court stayed Adame's sentences on counts 13 and 15 pursuant to section 654, because they concerned the same act and victims as indeterminate counts 8 and 10.

### 2.  Analysis

Adame contends that the trial court violated section 1170.1, subdivisions (f) and (g), by imposing and staying the great bodily injury enhancements on counts 11, 12, and 14, and the firearm enhancements on counts 13 and 15. He argues that these enhancements "should not have been imposed at all" because "subdivisions (f) and (g) of section 1170.1 gave the court authority to impose 'only the greatest' of the applicable enhancements, which in this case was the gang enhancements." In other words, he claims that the court "imposed" these enhancements to increase the punishment associated with the gang enhancement, rendering it the "greatest" of the applicable

enhancements, and could not impose (and stay) them again without violating section 1170.1, subdivisions (f) and (g).

Subdivisions (f) and (g) of section 1170.1 "mirror each other" and operate to "bar imposing two or more weapon enhancements for the same offense (subd. (f)) and two or more great-bodily-injury enhancements for the same offense (subd. (g))." (*People v. Ahmed* (2011) 53 Cal.4th 156, 165.) Section 1170.1, subdivision (f), provides: "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury." Similarly, section 1170.1, subdivision (g), provides: "When two or more enhancements may be imposed for the infliction of great bodily injury on the same victim in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for being armed with or using a dangerous or deadly weapon or firearm."

The Supreme Court explained the proper application of section 1170.1, subdivision (f) in *Rodriguez*, *supra*, 47 Cal.4th at pp. 508-509. In *Rodriguez*, a jury found the defendant guilty of three counts of assault with a firearm and further found that he personally used a firearm (§ 12022.5, subd. (a)) and committed the assaults to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)). (*Rodriguez*, *supra*, 47 Cal.4th at p. 504.) The trial court relied upon the firearm findings to conclude that each assault was a "violent felony" within the meaning of section 667.5, subdivision (c)(8), which elevated the punishment associated with the gang enhancements from two-to-four years to 10 years (§ 186.22, subds. (b)(1)(A), (b)(1)(C)). (*Rodriguez*, *supra*, 47 Cal.4th at p. 505.) The trial court then imposed and executed both the firearm enhancements and the gang enhancements. (*Id.* at p. 506.) The Supreme Court held that the double use of the enhancements violated section 1170.1, subdivision (f). (*Id.* at p. 504.) The Supreme

Court noted that defendant became eligible for the 10-year gang enhancement "*only* because he 'use[d] a firearm which use [was] charged and proved as provided in . . . Section 12022.5.' (§ 667.5, subd. (c)(8))." (*Rodriguez, supra*, 47 Cal.4th at p. 509.) "Thus, defendant's firearm use resulted in additional punishment not only under section 12022.5's subdivision (a) . . . but also under section 186.22's subdivision (b)(1)(C). . . . Because the firearm use was punished under two different sentence enhancement provisions, each pertaining to firearm use, section 1170.1's subdivision (f) requires imposition of 'only the greatest of those enhancements' with respect to each offense": the 10-year gang enhancement. (*Rodriguez, supra*, 47 Cal.4th at p. 509.) The *Rodriguez* court accordingly concluded that the trial court's imposition and execution of the section 12022.5 firearm enhancement violated section 1170.1, subdivision (f), and remanded the matter for resentencing to allow the trial court to restructure its sentencing choices. (*Ibid.*) The Court of Appeal later applied *Rodriguez* to conclude that imposition and execution of both a great bodily injury enhancement (§ 12022.7, subd. (a)) and a 10-year gang enhancement based on the great bodily injury finding (§ 186.22, subd. (b)(1)(C)) violated section 1170.1, subdivision (g). (*People v. Gonzalez, supra*, 178 Cal.App.4th at pp. 1327-1328, 1331-1332.)

Here, the assaults of which Adame was convicted in counts 11-15 (§ 245, subd. (b)) qualified as violent felonies subject to heightened 10-year gang enhancements only because the jury found true allegations of great bodily injury (counts 11, 12, and 14; § 12022.7, subd. (a)) and personal use of a firearm (counts 13 and 15; § 12022.5, subds. (a) and (d)). (§ 186.22, subd. (b)(1)(C).) Accordingly, imposing and executing both the 10-year gang enhancement and the great bodily injury or firearm enhancements used to elevate the gang enhancement to 10 years would violate section 1170.1, subdivisions (f) or (g), under the reasoning and holdings of *Rodriguez* and *People v. Gonzalez, supra*, 178 Cal.App.4th at pp. 1327-1328, 1331-1332. Yet unlike those cases, in which the trial courts imposed *and executed* the firearm and great bodily injury enhancements, the trial court here imposed *and stayed* those enhancements (and, moreover, stayed the sentences on counts 11-15 completely under section 654). This is a critical difference in our view.

It appears to be a critical difference in the eyes of the Supreme Court as well. In *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1122 (*Gonzalez*), the Supreme Court considered whether section 12022.53, subdivision (f), which provides that when "more than one enhancement per person is found true under this section, the court shall impose on that person the enhancement that provides the longest term of imprisonment," required that the enhancements providing shorter terms of imprisonment "must be stayed or stricken." The *Gonzalez* court concluded that the answer to the query was that "the remaining section 12022.53 firearm enhancements and any section 12022.5 firearm enhancements that were found true for the same crime must be imposed and then stayed." (*Gonzalez*, 43 Cal.4th at p. 1123.) The *Gonzalez* court arrived at this conclusion by construing the term "impose" as used in section 12022.53, subdivision (f), as shorthand for "impose and then execute." (*Id.* at p. 1126.) Accordingly, the *Gonzalez* court concluded that section 12022.53, subdivision (f), "directs that only one enhancement may be imposed and then *executed* per person for each crime, and allows a trial court to impose and then *stay* all other prohibited enhancements." (*Gonzalez*, *supra*, 43 Cal.4th at p. 1127.) Even though it did not rely upon California Rules of Court, rule 4.447[21] in its analysis (*id.* at p. 1130), the *Gonzalez* court also noted that the rationale underlying that rule and section 654 – preservation of the possibility that a stayed portion of a sentence could be imposed if the unstayed portion is reversed on appeal – also was served by its construction of section 12022.53, subdivision (f). (*Id.* at pp. 1128-1129.)

---

[21] Rule 4.447, entitled "Limitations on Enhancements," provides: "No finding of an enhancement may be stricken or dismissed because imposition of the term either is prohibited by law or exceeds limitations on the imposition of multiple enhancements. The sentencing judge must impose sentence for the aggregate term of imprisonment computed without reference to those prohibitions and limitations, and must thereupon stay execution of so much of the term as is prohibited or exceeds the applicable limit. The stay will become permanent on the defendant's service of the portion of the sentence not stayed." An Advisory Committee Comment to rule 4.447 notes that "[s]tatutory restrictions may prohibit or limit the imposition of an enhancement in certain situations," and cites among the exemplar statutory restrictions section 1170.1, subdivisions (f) and (g), and section 12022.53, subdivision (f). (Advisory Com. Com., Cal. Rules of Court, rule 4.447.)

Recently, in *People v. Le* (2015) 61 Cal.4th 416 (*Le*), the court applied the principles articulated in *Rodriguez* while implicitly endorsing the impose-and-stay procedure articulated in *Gonzalez*.  In *Le*, the defendant was convicted of assault with an automatic firearm (§ 245, subd. (b)), and the jury found true allegations that the defendant personally used a firearm (§ 12022.5, former subd. (a)(1)) and committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  (*Le*, at p. 420.) "At the sentencing hearing, the parties contested the applicability of *Rodriguez . . . .*" (*Id.* at p. 421.)  The trial court concluded that, "under *Rodriguez*, it could not impose terms for both enhancements because the jury's findings made defendant's assault a violent felony under section 667.5, thereby making the applicable enhancement the same 10-year term under 186.22, subdivision (b)(1)(C)" and accordingly "imposed the 10-year term for that enhancement, but *stayed* any sentence enhancement under section 12022.5, subdivision (a)." (*Le*, *supra*, at pp. 421, 422 [italics added].)  The court of appeal affirmed the trial court's imposition and stay of the section 12022.5 enhancement.  (*Id.* at p. 422.)  The Supreme Court likewise affirmed, while simultaneously holding that "a trial court is precluded from imposing both a firearm enhancement under section 12022.5, subdivision (a)(1) and a serious felony gang enhancement under section 186.22, subdivision (b)(1)(B) when the crime qualifies as a serious felony solely because it involved firearm use." (*Le,* at p. 429.)  Thus, it concluded that enhancements are not impermissibly double-counted where any duplicative enhancement is imposed and stayed.

We find the reasoning of *Gonzalez* persuasive in the context of section 1170.1, subdivisions (f) and (g), which contain similar language to that construed in *Gonzalez* and appear alongside section 12022.53, subdivision (f) in the Advisory Committee's Comment to California Rules of Court, rule 4.447.  We therefore interpret section 1170.1, subdivisions (f) and (g) as the trial court here did:  as prohibiting the imposition and *execution* of more than one enhancement based on a defendant's firearm use or infliction of great bodily injury.  Accordingly, like the Supreme Court in *Le*, we conclude that the trial court did not err by imposing and *staying* the firearm use and great bodily injury

enhancements at issue here after using them to heighten the gang enhancement. The sentences on counts 11-15 are affirmed.

**D.      Adame's abstract of judgment must be corrected to conform to the oral pronouncement of sentence on counts 2 and 3**

Adame's final contention is that his abstract of judgment, which shows that firearm enhancements (§ 12022.53, subd. (d)) were imposed but not stayed as to counts 2 and 3, must be amended to conform to the court's oral pronouncement of sentence, which indicated that these 25-years-to-life enhancements were stayed. The People concede that Adame is correct. We likewise agree that the abstract of judgment must be amended. The trial court's oral pronouncement of judgment is controlling; the abstract of judgment merely summarizes and cannot add to or modify the judgment. (*People v. Mesa* (1975) 14 Cal.3d 466, 471; *People v. Hartsell* (1973) 34 Cal.App.3d 8, 14.) We accordingly direct the trial court to correct the abstract of judgment by ordering the enhancements imposed pursuant to section 12022.53, subdivision (d), on counts 2 and 3 stayed. The judgment and sentence on those counts are otherwise affirmed.

**III.   Defendant Rodriguez**

Defendant Rodriguez argues that the trial court deprived her of her federal right to due process in four ways. First, she contends that the trial court denied her the right to confront witnesses against her by prohibiting her from cross-examining Alexis Garcia about or introducing evidence of a statement that she, Rodriguez, made outside of court. Second, she asserts that the trial court improperly instructed the jury on the natural and probable consequences doctrine. Third, she contends that the trial court erred in refusing to instruct the jury on the defense of duress. She is joined in her duress argument by defendant Rangel. Finally, Rodriguez contends that the trial court deprived her of due process (and violated section 654) by imposing and executing sentences for conspiracy and the murder attempt against Castro. We reject these contentions and affirm Rodriguez's conviction in all respects. With regard to her sentence, however, we agree with Rodriguez (and the People) that the abstract of judgment deviates from the trial court's oral pronouncement of judgment and accordingly direct the trial court to correct

71

the abstract of judgment by ordering the enhancements imposed pursuant to section 12022.53, subdivisions (d) and (e)(1), on counts 2 and 3 stayed.

**A.     The challenged evidentiary rulings were proper and did not deprive Rodriguez of her constitutional right of confrontation**

**1.     Background**

Alexis Garcia provided testimony that strongly implicated Rodriguez as a knowing participant in the March 16, 2010 drive-by shootings of Sergio Abrego and Miguel Castro. On direct examination, over defense objections including hearsay, Garcia testified that Rodriguez was on a cell phone when the group first left Rangel's apartment complex, saying "Are you coming? and things of that sort." Garcia also testified that Rodriguez was on the cell phone in the car during the drive to Canterbury and Filmore, saying things like "if they are coming," "they were on their way," and "if he was there yet and if they were coming." Garcia testified that Rodriguez (whom she referred to by her nickname, Danny Girl) got out of the car with her near Canterbury and Filmore, continued to talk on the cell phone – saying, "Are you here yet?" – and eventually instructed Garcia to get back into the dark-colored car in which they had been driven to the area. Garcia initially was unable to remember whether Rodriguez said anything when the van containing Abrego and Castro passed by. After having her recollection refreshed with the transcript of her interview with Detective Reade, however, Garcia recalled and testified that Rodriguez said "That's them" when the van drove past. Garcia also recalled after reviewing the transcript that Rangel directed Rodriguez to call Scrappy (Abrego), that Rodriguez directed Garcia to get out of the car, and that Rodriguez changed the location at which Scrappy was supposed to meet them.

On cross-examination, Rodriguez's attorney, Mark P. Brandt, attempted to ask Garcia whether Rodriguez said "anything about the van" while Rodriguez and Garcia were standing near Canterbury and Filmore. The trial court sustained the People's objection that the question called for hearsay not offered by a party opponent. It added, "Counsel, nothing about what Ms. Rodriguez says. It's hearsay. It's not offered by the party opponent." Brandt did not challenge the court's conclusion that the statements

72

were hearsay. Instead, he complained that "[i]t was inquired into by the prosecution." The court remained firm in prohibiting what it deemed "hearsay evidence of your client." Later, the court sustained a hearsay objection to Brandt's question about whether "the girl who was in the front seat of the car . . . said anything about - - after the shooting to you - - like I'm glad they shot them, anything like that." The court permitted Brandt to ask Garcia whether she could "really truthfully say what the words were today that [Rodriguez] said."

At a sidebar conference prior to the People's redirect examination of Garcia, Brandt explained to the trial court "where [he] was going" with his objected-to questions: he wanted the jury to hear testimony that Garcia gave at the second preliminary hearing. In particular, he wanted the jury to hear Garcia's testimony that when Rodriguez talked to Abrego on the phone after the shooting, she said only, "What happened?"

Brandt argued that Rodriguez's query "What happened?" should be admitted as a spontaneous statement uttered in the aftermath of the shooting—that is, as a hearsay statement that is admissible under an exception to the hearsay rule (see Evid. Code, § 1240) The court disagreed and further added that Brandt could not introduce the statement under Evidence Code section 1220 because Rodriguez (the declarant) was not a party opponent.

During their redirect examination of Garcia, the People played a tape of her interview with Detective Reade. (A full transcript of the interview also was admitted into evidence.) During that interview, Garcia told Reade, "I was there when they started calling, when she [Rodriguez] called him [Abrego] and told him that we were right there, to go ahead and pick us up." She continued, "And I was there when she [Rodriguez] called them [Abrego and Castro] after that and was like, What happened? I heard that, acting stupid." Later in the interview, Garcia told Reade that Rodriguez was "all like, [t]hat's them" when the van drove past.

During Brandt's recross-examination of Garcia, the court sustained the People's hearsay objections to his questions about what Rodriguez said about the van and what she said while she was on the phone. The court explained that Garcia's interview with

73

Detective Reade "was offered by the party opponent" and directed Brandt to ask another question. Brandt asked the court, "So I can't ask about that?," i.e., the interview tape and transcript, to which the court responded, "Go ahead. Next question." After sustaining more objections to Brandt's line of questioning about what Rodriguez said, the court reiterated that "You can ask anything you want about [People's exhibit] 84 [the interview tape], but you are not to ask anything in violation of Evidence Code [section] 1220." The court further indicated that Brandt could "certainly question a statement the People have already introduced" but could not introduce Rodriguez's hearsay statements himself. The jury accordingly did not hear Garcia's preliminary hearing testimony that Rodriguez said only, "What happened?" after the shooting. It heard only the more descriptive statement from Garcia's interview with Detective Reade, that Rodriguez said, "'What happened? I heard that,'" while "acting stupid." Brandt did not ask Garcia to explain or clarify her testimony about Rodriguez "acting stupid."

Brandt argued to the jury during closing that Garcia's testimony that Rodriguez was "acting stupid" when she asked Abrego "what happened, I heard that" after the shooting was not credible. Brandt urged the jury to view Rodriguez's comments, "What happened? I heard that," as evidence that she had no knowledge that the shooting was going to occur and was not party to an agreement to set up or shoot Abrego. In their rebuttal closing argument, the People disputed Brandt's characterization of Garcia's testimony. After replaying the relevant excerpt of Garcia's interview with Reade for the jury, co-prosecutor Hilary Williams told the jury, "I'm not going to argue to you what Alexis Garcia meant. You all heard it. You heard the inflection in her voice. You heard the way she was trying to mimic what Samantha Rodriguez said. She's not saying Samantha Rodriguez didn't know what was about to happen. She's doing it in a condescending way, saying like, Oh, where are you? What's going on? Acting like I'm just a bystander. I thought we were going to meet and hang out."

### 2.     Analysis

We begin by observing that Rodriguez does not challenge the court's ruling that her out-of-court statements were hearsay. She instead makes her arguments from the

74

premise that Garcia's interview "contained hearsay statements uttered by appellant but rendered inadmissible against her as a party opponent." Garcia's testimony about statements she personally heard Rodriguez making was not hearsay, however. "'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) Rodriguez's statements were "made other than by a witness while testifying at the hearing," but they were not "offered to prove the truth of the matter stated." They were offered to prove what was said or done, not whether those things were true or false. Rodriguez has forfeited any arguments that the statements were not hearsay or that the court erred in so ruling by failing to raise them in her briefs. Accordingly, we proceed to the arguments she did raise.

### a. Confrontation Clause

Rodriguez contends that the trial court's "refusal" to permit her to "cross-examine Garcia on the statements she attributed to appellant in her interview with Reade" violated her constitutional right to confrontation." She argues that "[o]nce the trial court admitted appellant's hearsay statement as recounted by Garcia to Reade, it was obligated to permit appellant to impeach that statement with appellant's statement as recounted by Garcia during [the preliminary hearing]." We disagree.

"'The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This federal constitutional right to confront adverse witnesses in a criminal prosecution applies to the states [Citation] and is also guaranteed independently by the California Constitution (Cal. Const., art. I, § 15) and by statute (§ 686). The primary reason an accused is entitled to confront adverse witnesses is to permit cross-examination. [Citations.] "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law." [Citation.]' [Citation.]"

75

(*People v. Wilson* (2008) 44 Cal.4th 758, 793.)  "'"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors. . . could appropriately draw inferences relating to the reliability of the witness.'" [Citation.]"  (*People v. Lucas*, *supra*, 60 Cal.4th at p. 271.)

"'"It does not follow, [however], that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.'" [Citation.]"  (*People v. Wilson*, *supra*, 44 Cal.4th at pp. 793-794.)  "'Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Citation.]"  (*Id.* at p. 794.)  "'Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' [Citation.]"  (*People v. Lucas*, *supra*, 60 Cal.4th at p. 271.)  Moreover, "[t]he routine and proper application of state evidentiary law does not impinge upon a defendant's due process rights."  (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 809.)

The trial court did not violate Rodriguez's right to confront and cross-examine Garcia.  To the contrary, the trial court expressly informed Rodriguez's attorney that he could cross-examine Garcia by asking about the statements she made during her interview with Detective Reade, including the statements the trial court classified as hearsay.  The trial court also did not place any restrictions on his ability to attack Garcia's credibility or probe the meaning of the phrase "acting stupid."

Even if the court did err by not permitting Rodriguez to elicit from Garcia testimony about her own out-of-court statements, Rodriguez has not shown that introducing those statements would have produced a significantly different impression of Garcia's credibility.  To the contrary, Rodriguez acknowledges that Garcia's various credibility problems, "such as her gang affiliation, history of drug abuse, and motive to

76

exaggerate appellant's level of culpability," were made known to the jury. She has not shown how the admission of preliminary testimony ("What happened?") that was substantially similar to testimony already introduced at trial ("What happened? I heard that, acting stupid") would have so undermined Garcia's credibility or so exculpated Rodriguez that the result would have been different, particularly where Rodriguez had ample opportunity to cross-examine Garcia about her testimony, including her use of the phrase "acting stupid."

### b. Evidentiary Rulings

In the alternative, Rodriguez claims that the trial court misapplied Evidence Code section 1220 by prohibiting her from cross-examining Garcia about the out-of-court statements that already were in evidence. She further contends that, under Evidence Code section 1202, she "should have been permitted to use her 'What happened?' statement as recounted by Garcia in the [preliminary hearing] to impeach the *other* inculpatory statements Garcia attributed to her on direct," such as "that's them" and directing Garcia to get out of the car. Rodriguez did not invoke Evidence Code section 1202 at trial, however, so she has forefeited this argument on appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 434-435; Evid. Code, § 353.) Even if we were to consider her argument about Evidence Code section 1202 on the merits, we would reject it, along with her contention about Evidence Code section 1220.

Evidence Code section 1220 provides in pertinent part that evidence "is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity." Rodriguez does not dispute either the court's conclusion that statements were hearsay or the propriety of the People's reliance on this code section to admit the statements Garcia overheard Rodriguez make on the cell phone. Instead, relying on *West v. Bechtel Corp.* (2002) 96 Cal.App.4th 966, 983 (*West*), she contends that "[a]fter a party's hearsay statement is introduced according to section 1220, it is elemental that the party is permitted to cross-examine the hearer of her statement." We agree with the People that *West*'s one-sentence discussion of this issue does not support Rodriguez's argument here.

77

In *West*, the plaintiff introduced under Evidence Code section 1220 hearsay statements made by his supervisor at defendant Bechtel Corporation. (*West*, *supra*, 96 Cal.App.4th at pp. 973, 982.) The *West* court summarily rejected plaintiff's claim that the defendant corporation could not cross-examine plaintiff concerning the supervisor's statements because they were "inadmissible hearsay" as to the defendant. (*Id.* at p. 982.) We fail to see how the *West* court's brief reference to the well-established right to cross-examine a party concerning statements made to him by a party opponent assists Rodriguez here. (See Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 1220, p. 71.) In fact, the trial court repeatedly invited Rodriguez's counsel to cross-examine Garcia and permitted him to inquire about Garcia's ability to accurately recall the events surrounding the shooting. Counsel's failure to make these inquiries was not a result of any error by the trial court.

We find equally unavailing Rodriguez's belated reliance on Evidence Code section 1202 and *People v. Baldwin* (2010) 189 Cal.App.4th 991, 1003 (*Baldwin*), overruled in part by *People v. Black* (2014) 58 Cal.4th 912, 919.) Evidence Code section 1202 provides in pertinent part that "[e]vidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing." *Baldwin* held that "the language [of Evidence Code section 1202] permits a criminal defendant to attack his own credibility as a hearsay declarant . . . by offering evidence of an inconsistent statement . . . , even though the defendant is available to testify for the defense but *cannot* be called by the prosecution to be examined about the inconsistent statement" (*Baldwin*, *supra*, 189 Cal.App.4th at p. 1004), subject to the limitations of Evidence Code section 352 (*id.* at p. 1005). The *Baldwin* court further explained that admission of the defendant's inconsistent statements permits the jury "to draw the inference that the party admissions

used by the prosecution cannot be trusted to be true, either because defendant has 'a moral disposition to lie' or because defendant has some other quality casting doubt on his accuracy on recounting the subject of the admissions and the inconsistent statement." (*Id.* at p. 1005.)[22]

Here, however, regardless of whether the statements were hearsay, Rodriguez was trying to undermine *Garcia's* credibility, not her own. The crucial words "acting stupid," which Garcia volunteered in her interview but not during the preliminary hearing, were Garcia's words, not Rodriguez's. The words "acting stupid" were Garcia's characterization of Rodriguez's conduct. Thus, Rodriguez could not rely upon Evidence Code section 1202 to introduce evidence of her own purportedly inconsistent statements. She could, however, as the trial court repeatedly advised, cross-examine Garcia about her belief that Rodriguez was "acting stupid" and her ability to hear or accurately remember Rodriguez's alleged statements. Rodriguez largely failed to avail herself of these opportunities.

Rodriguez also claims that she should have been permitted to use the "what happened?" statement from the preliminary hearing to demonstrate her own lack of knowledge of the Abrego set-up and impeach Garcia generally. Despite the admission of that very statement on redirect, however, Rodriguez did not make any attempt on recross-examination to cross-examine Garcia about it. Moreover, during closing argument, Rodriguez in fact made the very arguments she now claims she was prohibited from making: that her query "What happened? I heard that" was indicative of genuine ignorance and Garcia's claim she was "acting stupid" was not credible.

---

[22] In *Baldwin*, we urged the Legislature "to examine whether the rule of section 1202 should be amended to exclude criminal defendants seeking to attack their own credibility as declarants." (*Baldwin*, *supra*, 189 Cal.App.4th at p. 1005, fn. 11.)

**B.     Rodriguez was not prejudiced by the jury instructions pertaining to assault likely to produce great bodily injury and the natural and probable consequences doctrine**

Rodriguez next contends that the People "perform[ed] a bait-and-switch on the jurors" by arguing that she and Rangel could be guilty of attempted murder even if they only intended to aid and abet a beating – a beating she emphasizes never in fact occurred. Rodriguez further argues that the court's jury instructions facilitated the deception by defining "assault likely to produce great bodily injury" to include both assault with a firearm and with a deadly weapon other than a firearm; she claims that assault with a firearm is a materially different offense than assault with a deadly weapon other than a firearm. The upshot of her argument is that "[t]he trial court's erroneous instructions permitted the jurors to . . . convict appellant for the natural and probable consequences of an offense she didn't aid and abet." She acknowledges that errors involving the natural and probable consequences doctrine often are harmless but contends that this error was prejudicial in light of another instructional error concerning the conspiracy count. We reject her contentions.

**1.     Background**

Rodriguez was charged with four crimes relating to the March 16 shooting of Abrego and Castro:  one count of conspiracy to commit murder (§§ 182, subd. (a)(1) & 187, subd. (a)), two counts of attempted murder (§§ 187, subd. (a) & 664), and one count of shooting at an occupied vehicle (§ 246).  It is undisputed that Rodriguez did not personally fire at the van containing Abrego and Castro.  Evidence at trial concerning her foreknowledge that firearms would be involved in the incident was disputed, however, so the People invoked the natural and probable consequences doctrine as an alternative to direct aiding and abetting liability.  They argued, for instance, that "Even if [Rodriguez and Rangel] believed that it was just to assault him, just beat him up bad, the fact that they went with gangs, the fact that they knew that there was a rival coming, shows you that the natural and probable consequence of whatever beating they knew was going to happen, could be death."  The People further argued that "Even if you believe the girls

[Rodriguez and Rangel] didn't know about the guns, it doesn't matter, because it is a natural and probable consequence given the gang consequence and the gang nature of this crime, and the fact that they were bringing a rival to the location." That is, "at the very least," Rodriguez and Rangel intended for Abrego to be assaulted when he went to meet "Whisper" at Canterbury and Filmore. The People argued that if the jurors subscribed to this theory, they should acquit Rodriguez and Rangel of conspiring to commit murder but still convict them on the attempted murder counts "as aiders and abetters [*sic*]."

Rodriguez's attorney objected to the court's instruction on natural and probable consequences, a modified version of CALCRIM No. 403 ("Natural and Probable Consequences [Only Non-Target Offense Charged]"), on the grounds that the natural and probable consequences doctrine was inapplicable because "there was no talk of shooting anyone, causing any injury" and "[t]here's been no evidence that the girls had any intent to [com]mit an assault." The court overruled these objections – the only ones raised as to the proposed instruction – and ultimately delivered a modified version of CALCRIM No. 403 which stated, incorrectly, that conspiracy to commit murder could be a natural and probable consequence of assault likely to produce great bodily injury. The People concede this error.[23]

The court described the uncharged target offense of assault to the jury with a modified version of CALCRIM No. 875 ("Assault With Deadly Weapon or Force Likely to Produce Great Bodily Injury [Pen. Code, §§ 240, 245(a)(1)-(4), (b)]"). No one objected to the instruction, which provided in pertinent part:

"To prove that [*sic*] the crime of assault with force likely to produce great bodily injury, the People must prove that:

"1A. The defendant did an act that by its nature would directly and probably result in the application of force to a person,

---

[23] Subsequent to the close of briefing in this case, *People v. Smith, supra,* 60 Cal.4th at pp. 613-617 invalidated another statement included in the delivered instruction. That error operated in favor of defendants, however, such that it could not result in harm to them.

"1B.    The force used was likely to produce great bodily injury.

"2.    The defendant did that act willfully;

"3.    When the defendant acted, he was aware of facts that would lead a reasonable person to realize his act by its nature would directly and probably result in the application of force to someone;

"AND

"4.    When the defendant acted, he had the present ability to apply force likely to produce great bodily injury deadly weapon other than a firearm or with a firearm [sic]."

The court instructed the jury on conspiracy using a modified version of CALCRIM No. 563 ("Conspiracy to Commit Murder [Pen. Code, § 182]"). It instructed on attempted murder using modified versions of CALCRIM Nos. 600 ("Attempted Murder [Pen. Code, §§ 21a, 663, 664]") and 601 ("Attempted Murder:  Deliberation and Premeditation [Pen. Code, §§ 21a, 189, 664(a)]"), and on shooting at an occupied vehicle using CALCRIM No. 965 ("Shooting at Inhabited House or Occupied Motor Vehicle [Pen. Code, § 246]").  Rodriguez does not contend that any of these instructions were inaccurate.

The jury found Rodriguez guilty of all four charged counts.  The jury further found that both counts of attempted murder were committed willfully, deliberately and with premeditation.

### 2.    Analysis

Rodriguez contends that the court instructed the jury on a legally invalid theory because "there was no beating, and thus no crime upon which to base natural and probable consequence liability."  She further claims the error was compounded by the muddled reference in modified CALCRIM No. 875 to "likely to produce great bodily injury deadly weapon other than a firearm or with a firearm," an amalgam that encompassed two distinct crimes, assault by means of force likely to produce great injury (§ 245, subd. (a)(1)) and assault with a firearm (§ 245, subd. (a)(2)). She contends that "[i]f appellant was proven only to have formed the intent to aid and abet the former—that

82

is, if appellant intended to aid and abet a beating but not a shooting—she was not liable as a matter of law for the natural and probable consequences of the latter offense."

Rodriguez's first contention is predicated on a flawed understanding of the natural and probable consequences doctrine, which does not require the target offense to be committed. (*People v. Ayala* (2010) 181 Cal.App.4th 1440, 1451-1452 (*Ayala*).) "The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the policy [that] . . . aiders and abettors should be responsible for the criminal harms they have naturally, probably, and foreseeably put in motion.' [Citations.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 164-165.) The foreseeability of the ultimate harm "is likely to be attenuated if the target criminal act is only contemplated and never committed," but there is no "categorical rule that forseseeability of harm never exists if the target criminal act was not committed, and a different criminal act was committed." (*Ayala*, *supra*, 181 Cal.App.4th at p. 1452.) Like the *Ayala* court, we recognize that in some circumstances it may be unreasonable for a defendant who intended to assist with a fistfight to expect one of his compatriots to use a gun. As in *Ayala*, however, "[t]his was not a spontaneous fistfight" (*ibid*.); instead, the plan was to lure a known gang rival to an intersection late at night under the false pretense of meeting Whisper in person. "Our Supreme Court has recognized that the gang-related nature of an assault – even one without weapons – may provide the trier of fact with sufficient evidence to conclude that 'escalation of the confrontation to a deadly level was reasonably foreseeable.' (*People v. Medina* (2009) 46 Cal.4th 913, 922-923.)" (*Ayala*, *supra*, 181 Cal.App.4th at p. 1452.) "No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them." (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.)

Rodriguez's second contention likewise cannot carry the day. The trial court has a sua sponte duty to identify and describe uncharged target offenses that form a part of the prosecution's theory "to minimize the risk that the jury, generally unversed in the intricacies of criminal law, will 'indulge in unguided speculation' [citation] when it

applies the law to the evidence adduced at trial." (*People v. Prettyman* (1996) 14 Cal.4th 248, 267.) Notably, however, the jury need not unanimously agree on the particular target offense the defendant aided and abetted. (*Id.* at pp. 267-268.)

Here, the trial court inartfully – but without objection from any of the defendants – instructed the jury that it could find Rodriguez and Rangel guilty of attempted murder if it found they aided and abetted the other defendants' efforts to inflict upon Abrego "force likely to produce great bodily injury [with a] deadly weapon other than a firearm or with a firearm." To the extent this language may be read to describe legally distinct target offenses of a beating and a shooting, a point which the parties dispute, the evidence unequivocally supported the conclusion that defendants intended to assault Abrego with or without a firearm—and the jurors did not have to agree on any particular target offense. (Nor did the court have an obligation to instruct on "*all* potential target offenses supported by the evidence, but only those that the prosecution wishe[d] the jury to consider." (*People v. Prettyman*, *supra*, at p. 269.)) Uncontroverted evidence demonstrated that gang members routinely subject their rivals to physical violence for no reason beyond their opposing affiliations, to avoid being perceived as weak. The circumstances of the encounter between defendants and Abrego compelled the inference that defendants intended to inflict violence upon rival gang member Abrego when they posed as Whisper to lure him to an intersection late at night. As Rodriguez herself puts it, "everyone knows that when gang members are intent on fighting, it is probable they will end up using lethal force." "Given the great potential for escalating violence during gang confrontations, it is immaterial whether [Rodriguez] specifically knew [her codefendants] had a gun" (*People v. Montes*, *supra*, 74 Cal.App.4th at p. 1056) or intended to raise the stakes beyond fisticuffs. In any event, the remaining elements of the instruction as given are equally applicable, whether the force used was generated by a gun, another weapon, or even the actor's own body; a potentially fatal shooting is the natural and probable consequence of any of these types of force in the gang context.

This is not to say that we are not troubled by the instructional issues Rodriguez raises here. We also agree with Rodriguez and the People that the inclusion of

conspiracy to commit murder among the crimes within the ambit of the natural and probable consequences doctrine was erroneous.

Nonetheless, we do not find it reasonably likely that the jurors understood the instructions as a whole in a manner that violated Rodriguez's rights. (*People v. Hajek, supra,* 58 Cal.4th at p. 1246.) "'"The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]'" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.) The error here was cured by the court's proper instruction that the conspiracy count required the People to prove defendants agreed and intended to "intentionally and unlawfully kill" and "had an agreement and intent to commit murder." Additionally, the People repeatedly invited the jury to acquit Rodriguez and Rangel on the conspiracy count if it applied the natural and probable consequences doctrine. The jury's guilty verdict on the conspiracy count – and its findings that the attempted murders were willful and premeditated and not simply an escalated consequence of a target offense–indicates that it rejected the natural and probable consequences theory in favor of the People's lead theory of direct aiding and abetting.

## C. Rodriguez and Rangel were not entitled to a duress instruction

Rodriguez and Rangel both contend that the court deprived them of their right to present a defense by denying their request to instruct the jury with CALCRIM No. 3402, which sets forth the complete defense of duress. (See § 26, subd. Six) The court denied the request on two grounds: lack of substantial evidence and *People v. Anderson* (2002) 28 Cal.4th 767, 771-783, which holds that duress does not constitute a defense to murder. Rodriguez and Rangel contend that both of these grounds were faulty. We need not resolve the latter issue (see *People v. Vieira* (2005) 35 Cal.4th 264, 290 [leaving open the question whether duress may be a defense to conspiracy to commit murder]); even if the defense of duress is legally applicable to the charged crimes in the abstract, Rodriguez and Rangel have not presented substantial evidence justifying the instruction in this case.

Duress is available as a complete defense to a defendant who commits a crime "under threats or menaces sufficient to show that they had reasonable cause to and did

believe their lives would be endangered if they refused." (§ 26, subd. Six; see also *People v. Vieira*, *supra*, 35 Cal.4th at pp. 289-290.) Duress "negates the intent or capacity to commit the crime charged." (*People v. Petznick* (2003) 114 Cal.App.4th 663, 676.) "Defendant needs to raise only a reasonable doubt that he acted in the exercise of his free will. [Citation.] In order to show that his act was not the exercise of his free will, defendant must show that he acted under an immediate threat or menace." (*Ibid.*) "'Because of the immediacy requirement, a person committing a crime under duress has only the choice of *imminent death* or executing the requested crime. The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent. . . . [Citation.]' [Citation.]" (*Ibid.* [emphasis added].) "'The common characteristic of all the decisions upholding [a duress defense] lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict[s] a phantasmagoria of future harm.' [Citations.]" (*People v. Vieira*, *supra*, 35 Cal.4th at p. 290.) "A trial court is required to instruct sua sponte on a duress defense if there is substantial evidence of the defense and if it is not inconsistent with the defendant's theory of the case." (*People v. Wilson* (2005) 36 Cal.4th 309, 331.) "'Substantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.'"' [Citations.]" (*Ibid.*)

The evidence Rodriguez and Rangel rely on simply does not support the inference that either one of them acted under "an immediate threat of mortal harm" at any time on March 15 or 16. Collectively, it consists of the following: Gang expert Rodolfo Rodriguez testified that gangs "conduct their business in order to gain respect. But in reality, respect is fear and intimidation." Gang expert Fernando Avila testified that male gang members "at times" use force or threats against female members and associates to get them to commit crimes. Estepanie Cortez, Gonzalez's ex-girlfriend, testified that Gonzalez told her that he "used" D Girl and Trippy – Rodriguez and Rangel – to call Scrappy (Abrego). She also gave conflicting testimony as to whether Gonzalez told her that he "forced" Rodriguez and Rangel to set up Scrappy; at one point she said that she

did not remember him saying "forced," at two others, she said that Gonzalez told her that he "forced" Rodriguez and Rangel (and Garcia) to set up Scrappy. (No one asked Cortez to explain what she understood "forced" or "used" to mean.) In one of the tape-recorded calls Cortez made to Gonzalez, she told him that Rangel had told her that Gonzalez "threatened" Rangel; Gonzalez responded "Oh, yeah?" Cortez further testified at trial that she "only knew Myra [Rangel] being threatened." (Rodriguez asserts that "[i]f Gonzalez had to threaten Rangel, he likely had to threaten [her] as well.") Both Rangel and Rodriguez also point generally to the "overwhelming evidence that Gonzalez and Adame were extremely violent gang members."

None of this evidence, considered separately or together, raises a reasonable inference that Gonzalez or Adame acted as "a present and active aggressor threatening immediate danger" (*People v. Vieira*, *supra*, 35 Cal.4th at p. 290) to prompt Rodriguez or Rangel to play a role in the Abrego shooting. There is no indicia of an immediate threat to their lives or limbs; the vague terms "threat," "used," and "forced" suggest at best "a phantasmagoria of future harm." (*Ibid.*) Moreover, the evidence demonstrates that Rodriguez and Rangel overcame any reluctance they may have had. Both of them continued their active participation in the scheme and continued to lure Abrego to Canterbury and Filmore even when they were in a separate car from Gonzalez and Adame. (See *People v. Petznick*, *supra*, 114 Cal.App.4th at p. 677.) Their suggestion that their participation was coerced by an imminent threat to their lives is not supported by evidence. The trial court did not err in refusing to give the duress instruction.

### D. Rodriguez's sentence on count 4 did not violate section 654

The court sentenced Rodriguez to a total of 50 years to life on count 1, the conspiracy count: a base term of 25 years to life "plus a consecutive 25 years to life for the principal's discharge of a firearm, causing great bodily injury, pursuant to Penal Code section 12022.53(d) and (e)(1)." Citing section 654, the court imposed and stayed sentence on counts 2 and 3, the attempted murder of Abrego and shooting at an occupied motor vehicle, because those counts involved the same intent, act, and victim as count 1. The court imposed and executed an additional sentence of life plus 25 years to life on

count 4, the attempted murder of Castro, and ordered the sentence on count 4 to run consecutive to count 1's sentence "because they each have a separate victim." Rodriguez contends that "section 654 demanded a different outcome. It required that the trial court either (a) impose and execute punishment on the conspiracy while staying punishment on *both* attempted murders, or (b) impose and execute punishment on both attempted murders while staying punishment on the conspiracy." This is so, she argues, because the object of the charged conspiracy was to create a kill zone around Abrego. We disagree.

Section 654, subdivision (a) provides in pertinent part that "any act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." This provision bars multiple punishments for separate offenses arising out of a single occurrence where all of the offenses were incident to a single objective. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, overruled in part by *People v. Scott*, supra, 61 Cal.4th at p. 391, fn. 3.) We will uphold a trial court's implicit finding that a defendant harbored separate intents and objectives for multiple offenses if it is supported by substantial evidence. (*Ibid.*) Section 654 does not apply where a single act results in acts of violence against multiple individuals. (*People v. Oates* (2004) 32 Cal.4th 1048, 1063.) This is because "'[a] defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person.'" (*Ibid.*) Attempted premeditated murder qualifies as a crime of violence for purposes of the multiple-victim exception. (*Ibid.*)

Here, the People argued and the evidence overwhelmingly established that defendants, including Rodriguez, agreed to and set out to kill Abrego. There is nothing in the record suggesting that their conspiratorial aims extended beyond him. The jury instruction on conspiracy reflects this; it repeatedly refers to the "victim rival gang member" in the singular. Indeed, the People readily conceded to the jury that they would be "hard-pressed to stand up in front of you and say they left that apartment wanting to kill Miguel Angel Castro. They probably didn't even know Miguel Angel Castro was

88

coming." There likewise is no evidence in the record suggesting that defendants agreed on and incorporated into their conspiracy a specific means by which to accomplish their goal. Rodriguez points to a few statements made by the People, but those comments are not evidence. (*People v. Perez*, *supra*, 2 Cal.4th at p. 1126.) Even if they were, the comments–"[t]hey wanted to kill Sergio Abrego so badly, they would kill him and anyone in his zone," "they intended to kill Sergio Abrego, as well as anyone in his group, or in his zone," "and "you got aider and abettor and kill zone working together"– do not establish a conspiratorial objective to kill Castro or anyone else in addition to Abrego. The means by which defendants sought to kill Abrego, using semiautomatic firearms to pump a barrage of bullets into the van in which he was riding, were likely to cause harm to others near Abrego. And "a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons" – i.e., creates a kill zone (see *People v. Bland*, *supra*, 28 Cal.4th at pp. 329-330) – "is properly subject to greater punishment than a defendant who chooses a means that harms only a single person." (*Neal v. State* (1960) 55 Cal.2d 11, 20, disapproved by *People v. Correa* (2012) 54 Cal.4th 331, 334; see also *People v. Ramirez* (1992) 6 Cal.App.4th 1762, 1767.) In short, Rodriguez's argument fails not only because substantial evidence supported the trial court's implicit conclusion that defendants harbored separate objectives for the conspiracy and the attempted murder of Castro, but also because their acts of violence caused harm to multiple victims.

**E.     Rodriguez's abstract of judgment must be corrected to conform to the oral pronouncement of sentence on counts 2 and 3**

Rodriguez's final contention is that her abstract of judgment, which shows that firearm enhancements (§ 12022.53, subds. (d) & (e)(1)) were imposed but not stayed as to counts 2 and 3, must be amended to conform to the court's oral pronouncement of sentence, which indicated that these 25-years-to-life enhancements were stayed. The People concede that Rodriguez is correct. For the same reasons stated above in connection with Adame's identical argument (*ante* Discussion, subd. (II)(D)), we agree and direct the trial court to correct the abstract of judgment by ordering the enhancements

imposed pursuant to section 12022.53, subdivisions (d) and (e)(1), on counts 2 and 3 stayed. The judgment and sentence on those counts are otherwise affirmed.

## IV. Defendant Rangel

Defendant Rangel raises three arguments in addition to the duress argument already discussed. (See *ante*, Discussion, subd. (III)(C).) First, she contends that her trial counsel was ineffective for failing to move to sever counts 1-4 from counts 5-17 and that such a motion should have been granted to ensure her right to due process and a fair trial. Second, she contends that her sentence–she received a total of 75-years-to-life–is the functional equivalent of a life sentence without the possibility of parole and amounts to cruel and unusual punishment in light of her age and culpability. Finally, she argues that the trial court's imposition of lengthy sentence enhancements based on the conduct of other principals violates constitutional guarantees of equal protection and due process. We reject these contentions and affirm Rangel's conviction and sentence in all respects.

### A. Severance

#### 1. Rangel's counsel was not ineffective for failing to move to sever

The sole ground on which Rangel claims her trial counsel, Frank DiSabatino, was ineffective is his failure to move to sever the trial of counts 5-17, in which she was not charged, from trial of the charges in counts 1-4, in which she was charged along with Gonzalez, Adame, and Rodriguez.[24] To prevail on this claim, Rangel must make a two-pronged showing regarding counsel's alleged inadequacy. First, she must "show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms." (*Mai*, *supra*, 57 Cal.4th at p. 1009.) Second, she "must show resulting prejudice, i.e., a reasonable probability that, but

---

[24] Rodriguez's counsel moved to sever on the third day of jury voir dire but the court denied the motion as untimely and did not consider its merits. It appears from the exchange surrounding this motion that Rodriguez's counsel filed a motion to sever the charges against her from the *first* information filed against Gonzalez, Rodriguez, and Rangel, but did not refile the motion after the first information was dismissed and the second information naming all four defendants in an entirely new case became operative. Our conclusion that Rangel's counsel was not ineffective for failing to move to sever applies equally to Rodriguez's counsel.

90

for counsel's deficient performance, the outcome of the proceeding would have been different." (*Ibid.*)  A reasonable probability is one sufficient to undermine confidence in the outcome.  (*People v. Brown* (2014) 59 Cal.4th 86, 109.)  As noted above, "[i]t is particularly difficult to prevail on an appellate claim of ineffective assistance." (*Mai*, *supra*, 57 Cal.4th at p. 1009.)  Rangel's claim is no exception.

As to the first prong, deficient performance, Rangel simply asserts, "On this record, there can be no informed tactical reason for trial counsel's failure to move for severance."  The People appear to accept this assertion at face value, "assuming (without conceding) appellant Rangel's counsel had no valid tactical reason to forego [*sic*] making a severance motion."  We have some doubts that this assertion is sufficient to satisfy Rangel's burden of establishing deficient performance, however.  Reviewing courts "indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy," and where, as here, "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation."  (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)  Here, that presumption is particularly strong, since the trial court would have been well within its discretion to deny a motion to sever, and "defense counsel's decision not to file a motion he believes will be futile does not ""'substantially impair' . . . defendant's right to effective assistance of counsel.'" [Citations.]"  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 804-805.)

Section 954 authorizes the joinder of multiple offenses of the same class of crimes or offenses in a single accusatory pleading.  It also vests the trial court with discretion to order, "in the interests of justice and for good cause shown," that "different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."  (§ 954.)  "Because it ordinarily promotes efficiency, joinder is the preferred course of action.  When the statutory requirements are met, joinder is error only if prejudice is clearly shown."  (*People v. Scott*

(2011) 52 Cal.4th 452, 469.) That is, joinder is erroneous only when its benefits are outweighed by the potential prejudice to the defendant. (*People v. Soper* (2009) 45 Cal.4th 759, 775.) "'"'In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.'" [Citations.] "The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case." [Citation.]'" (*People v. Scott, supra*, at pp. 469-470.) In other words, "[t]o justify severance the characteristics or culpability of one or more defendants must be such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue." (*People v. Bryant* (2014) 60 Cal.4th 335, 383.)

Rangel does not dispute that joinder of counts 1-4 with counts 5-17 was proper under section 954. She argues instead that the "relevant factors" that inform the trial court's decision to sever all militate in favor of severance. We disagree.

We begin our analysis with the second factor, whether the joined charges were unduly inflammatory, because "'even if cross-admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion.' [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 849-850; see also *People v. Myles* (2012) 53 Cal.4th 1181, 1201.) Here, the joined charges included one count of murder, six counts of attempted murder, five counts of assault with a semiautomatic firearm, and one count of street terrorism. These charges are no more egregious or inflammatory than those Rangel herself faced: conspiracy to commit murder, attempted murder, and shooting at an occupied vehicle. (See *People v. Soper*, *supra*, 45 Cal.4th at

92

p. 780.) Rangel asserts that the injuries suffered by the victims in counts 5-16 were far more serious than those suffered by Abrego and Castro and therefore rendered those counts unduly inflammatory. She does not cite any authority for this proposition, and we are not persuaded by it. The relative lack of injury to Abrego, who suffered only a through-and-through bullet wound, and Castro, who emerged from the March 16 shooting unscathed, was due to chance, not the nature of the charged offenses.

We also reject Rangel's contention that evidence of the racial motivations underlying the March 23 shooting – Cortez testified that Gonzalez told her he "hated" African Americans, and Davalos testified that Adame said "them niggas owed" – "was, without question, likely to inflame the jury." "Expressions of racial animus by a defendant towards the victim and the victim's race, like any other expression of enmity by an accused murderer towards the victim, is relevant evidence in a murder or murder conspiracy case" and "[w]hile offensive, the use of such language by a defendant is regrettably not so unusual as to inevitably bias the jury against the defendant" (*People v. Quartermain* (1997) 16 Cal.4th 600, 626), let alone his codefendants who had nothing to do with that particular crime. In any event, the jury heard evidence that Rangel personally used the same racial slurs in a letter she sent to Gonzalez apologizing for talking to the police about the March 16 shooting which it presumably would have heard even if the counts pertaining to the March 23 and 24 incidents had been severed.

Likewise, the firearms and alibi fabrication evidence related to counts 5-16 was not so inflammatory as to suggest that the trial court would have abused its discretion in denying a motion to sever. Evidence that Gonzalez possessed 18 firearms – none of which was tied to any of the charged crimes – was not unduly prejudicial to Rangel. Nor was the evidence suggesting that Gonzalez and Adame sought to contrive an alibi for the March 23 shootings; Rangel's letter to Gonzalez stated that she, too, initially lied to police about her involvement in the March 16 incident. In short, it does not appear that a reasonable jury would have found the additional charges against Gonzalez or Adame and the evidence pertaining only to those charges so inflammatory to warrant convicting Rangel of distinct counts simply because of her association with Gonzalez and Adame,

93

rather than because her individual guilt had been proven (see *People v. Bryant, supra,* 60 Cal.4th at p. 383), particularly where it was expressly instructed to "decide each charge for each defendant separately."

The third – and final relevant – factor is whether a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges. (*People v. Scott*, *supra*, 52 Cal.4th at p. 469.) Rangel contends this factor required the severance of counts 1-4 from counts 5-17 because "[t]here was overwhelming evidence that Gonzalez and Adame were perpetrators of the shootings on March 23 and 24, 2010," but "the prosecution relied upon the testimony of an accomplice, Alexis Garcia, to establish that appellant was involved in luring Abrego to the March 15, 2010 shooting." We are not persuaded. Testimony from witnesses with credibility problems constituted a significant portion of the People's evidence on virtually every count in this case. The only testimony that definitively linked Gonzalez and Adame to the March 23 and March 24 shootings came from Erick Davalos, who, like Garcia, was a potential accomplice in the events to which he testified and was granted immunity in exchange for his testimony. "[I]t always is possible to point to individual aspects of one case and argue that one is stronger than the other." (*People v. Soper*, *supra*, 45 Cal.4th at p. 781.) Here, however, we are not convinced that any imbalance in the strength of the cases, or the alleged strength in numbers associated with trying all of the counts in a single proceeding, was likely to sway the jury to convict Rangel on improper grounds.

Because an analysis of the pertinent factors indicates that the trial court would not have abused its discretion in denying a motion to sever had one been timely made, we cannot conclude that there was a reasonable probability that the outcome would have been more favorable to Rangel had DiSabatino made the motion, which likely would have been futile in any event. (*People v. Hawkins* (1995) 10 Cal.4th 920, 941.) We accordingly reject her ineffective assistance of counsel claim.

## 2. Joinder did not result in gross unfairness to Rangel

Our rejection of Rangel's ineffective assistance of counsel claim does not immediately end our inquiry into the severance issue. It is clear that "even when a trial court's denial of severance was not an abuse of discretion at the time it was made, we must reverse the judgment on a showing that joinder actually resulted in ""'gross unfairness"''" amounting to a denial of fair trial or due process." (*People v. Myles*, *supra*, 53 Cal.4th at p. 1202; *People v. Merriman* (2014) 60 Cal.4th 1, 46.) Rangel suggests we should undertake this inquiry despite DiSabatino's failure to make a motion to sever in the first instance. Our Supreme Court "never has adopted the position urged by defendant, however." (*People v. Rogers* (2006) 39 Cal.4th 826, 851.) Like the Supreme Court in *People v. Rogers*, "[w]e need not decide whether review for gross unfairness is available in the absence of a motion to sever or an objection to joinder, for even if such review is available, gross unfairness did not result in the present case." (*Ibid.*)

There is no indication that the evidence relating to counts 5-17 was so inflammatory or otherwise prejudicial to Rangel as to call into question the integrity of her conviction on counts 1-4. The evidence implicating Rangel in the conspiracy, attempted murders, and drive-by shooting in which she was charged was strong. Garcia testified at length about Rangel's involvement, Danny Perez, Detective Reade, and even her cousin Erick Davalos offered corroborating testimony, and Rangel's own letter to Gonzalez inculpated her in the March 16 incident. The gang evidence about which Rangel primarily complains was directly relevant to material issues in the counts against her, all of which included gang enhancements. (*People v. Burnell* (2005) 132 Cal.App.4th 938, 947; *People v. Montes* (2014) 58 Cal.4th 809, 859.) The People's isolated characterization of the charged crimes as a single "crime spree" does not suggest that the People impermissibly used joinder to bootstrap the case against Rangel, nor does it constitute a violation of Rangel's due process rights.

### B. Rangel's sentence does not constitute cruel and/or unusual punishment

Rangel was sentenced to a total term of 75-years- to-life plus a life term with the possibility of parole. On count 1 (conspiracy to commit murder), the court imposed a

sentence of 25-years-to-life, plus a consecutive 25-years-to-life for the enhancements under section 12022.53, subdivisions (d) and (e)(1). The court imposed and stayed the other section 12022.53 enhancements associated with count 1. On count 2 (attempted murder of Abrego), the court imposed a life term plus a consecutive 25 years to life for the enhancements under section 12022.53, subdivisions (d) and (e)(1).[25] The court imposed and stayed the other section 12022.53 enhancements, and stayed the entire sentence on count 2 pursuant to section 654. On count 3 (shooting at an occupied motor vehicle), the court imposed a life sentence pursuant to the gang enhancement under section 186.22, subdivision (b)(4)(B). The court imposed an additional term of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1), and imposed and stayed other enhancements under section 12022.53. The court stayed the entirety of count 3 pursuant to section 654. On count 4 (attempted murder of Castro), the court imposed and executed a life term, plus an additional 25-years-to-life for the enhancement under section 12022.53, subdivisions (d) and (e)(1). The court ordered the sentence on count 4 to run consecutive to the sentence on count 1 "because they each have a separate victim." Rangel contends that her sentence amounts to cruel and/or unusual punishment in light of her young age and limited culpability. We disagree.

The Eighth Amendment to the United States Constitution (which is applicable to the states (*People v. Caballero* (2012) 55 Cal.4th 262, 265 fn. 1 (*Caballero*)) and Article I, section 17 of the California Constitution both prohibit cruel and/or unusual punishment. The Eighth Amendment prohibits "'cruel *and* unusual'" punishment, while the California Constitution prohibits "'cruel *or* unusual'" punishment. This distinction in wording "'is purposeful and substantive rather than merely semantic. [Citation.]' [Citation.] As a result, we construe the state constitutional provision 'separately from its counterpart in the federal Constitution. [Citation.]' [Citation.] This does not make a difference from an analytic perspective, however [citation], and defendant does not contend the provisions

_____

[25] The court did not orally state that the enhancements under section 12022.53, subdivisions (d) and (e)(1), were to be stayed in Rangel's case. Rangel does not challenge the accuracy of her sentence.

96

should be separately analyzed in [her] case [citations]." (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82.) "Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment." (*Ibid.*; see also *People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.) The touchstone under either provision is gross disproportionality. (*People v. Palafox*, *supra*, 231 Cal.App.4th at p. 82.) In determining whether a sentence is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity" (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted), we examine the nature of the offender and offense, compare the punishment with those imposed in California for more serious crimes, and compare the punishment with those imposed for the same offense in other jurisdictions. (*Id.* at pp. 425-427; *People v. Meneses* (2011) 193 Cal.App.4th 1087, 1092.)

Rangel focuses primarily on the first prong of the tripartite test. Relying on *Graham v. Florida* (2010) 560 U.S. 48, 82, *Miller v. Alabama* (2012) 132 S. Ct. 2455, 2467-2468, and *Caballero*, *supra*, 55 Cal.4th at p. 268 for the proposition that the Eighth Amendment prohibits sentencing juveniles to even de facto life imprisonment without the possibility of parole, she argues that her sentence cannot stand because she was "less than a year removed from being a juvenile" at the time of the March 16, 2010 incident. Rangel acknowledges that the prohibition on life sentences without the possibility of parole in these cases has been strictly limited to juveniles under age 18, but asserts that her relative proximity to that critical age, coupled with the indirect nature of her participation in the shooting, renders the punishment she received unconstitutional.

We expressly rejected the first portion of her argument in *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482, and, despite Rangel's "disagree[ment]" with our reasoning there, we reach the same conclusion here. As we explained in *Argeta*: "These arguments regarding sentencing have been made in the past, and while '[d]rawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules . . . [, it] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.] Making an exception for a defendant who committed a crime

97

just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude [Rangel's] sentence is not cruel and/or unusual under *Graham*, *Miller*, or *Caballero*." (*People v. Argeta*, *supra*, 210 Cal.App.4th at p. 1482.) Rangel was an adult (and a mother) at the time of the incident, and her attempts to equate her situation to cases involving juveniles are not persuasive.

We also reject Rangel's contention that her role in the March 16 incident renders her culpability below that necessary to warrant the lengthy sentence she received. "'The Legislature has determined those who aid and abet and those who actually perpetrate the offense are principals and equally culpable.' [Citation.]" (*People v. Smith*, *supra*, 60 Cal.4th at p. 613; see § 31.) Thus, Rangel's vicarious participation in the shooting itself does not mitigate her culpability, which was readily apparent from the evidence adduced at trial. Rangel played an instrumental role in facilitating the March 16 shooting even though she did not personally pull the trigger. She had access to Perez's phone, which was critical to defendants' plan to set up Abrego, a member of a rival gang who had called her a "reject bitch." She provided encouragement throughout the incident, directed Rodriguez to make phone calls (even if she did not make them herself), ordered Rodriguez and Garcia out of the car at the appointed meeting place, and laughed about the incident. These actions plainly aided and abetted the shooting and evinced Rangel's culpability. We agree with the People that "[t]he results of appellant Rangel's machinations was that Abrego suffered gunshot wounds to his legs and Castro's van was riddled with bullets. That neither Abrego nor Castro died was merely a mixture of poor marksmanship and sheer luck." Rangel's sentence reflects her culpability and does not "shock[ ] the conscience and offend[ ] fundamental notions of human dignity." (*In re Lynch*, *supra*, 8 Cal.3d at p. 424.)

98

Nor is it grossly disproportionate when compared to sentences imposed for the more severe crime of first degree murder in California.[26] The statutorily prescribed punishments for that crime – which, we reiterate, did not transpire here only because of lucky circumstances – range from a low of 25 years to life to a high of death. (§ 190, subd. (a).) Rangel's imposed and executed sentence of 75 years to life for two convictions of attempted murder, one conviction of conspiracy to commit murder, and one conviction of shooting at an occupied vehicle, is in line with these prescribed punishments, particularly in light of her active and ready participation throughout the incident. Rangel's contention that the holding of *People v. Chiu*, *supra*, 59 Cal.4th 155, "illustrates the relative unfairness of *sentencing* an aider and abettor who may have been convicted under the natural and probable consequences doctrine, absent proof of intent to kill, to a harsher sentence than a defendant was is [*sic*] properly convicted of first-degree murder" does not persuade us otherwise. *People v. Chiu* did not alter the longstanding rule that aiders and abettors may still be convicted of first degree murder based on direct aiding and abetting principles (*People v. Chiu*, *supra*, 59 Cal.4th at p. 166), and the jury's guilty verdict on the conspiracy count and findings that the attempted murders were willful and premeditated indicate that it rejected the natural and probable consequences theory in favor of the People's lead theory of direct aiding and abetting. Moreover, Rangel concedes that "the holding of *Chiu* . . . is not applicable to conspiracy to commit murder," and points only to inapplicable juvenile cases in support of her claim that she received a harsher punishment than a murderer who succeeded in killing his victims.

C.     **The imposition of firearm enhancements did not violate Rangel's equal protection or due process rights**

The People alleged and the jury found true that counts 1-4 were committed for the benefit of, at the direction of, or in association with a criminal street gang with the

_____

[26] Rangel does not compare her punishment to those imposed for the same offense in other jurisdictions. She asserts that doing so is "unnecessary" in light of "the grossly excessive punishment for far more serious crimes in the same jurisdiction," i.e., California. Although we disagree with Rangel's rationale, we agree that this factor is minimally relevant under the circumstances here.

specific intent to promote, further, and assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(C). The jury further found true as to all four counts that "a principal personally and intentionally discharged a firearm, a handgun, which proximately caused great bodily injury" within the meaning of section 12022.53, subdivisions (d) and (e)(1). As a consequence of these findings, the sentences imposed and executed on counts 1 and 4 each included a firearms use enhancement of 25 years to life. (§ 12022.53, subds. (d) & (e)(1)). Rangel contends that these enhancements violate her equal protection and due process rights because she did not wield the weapons or know of their presence. She claims that there is no rational basis for "singling out aiders and abettors in gang shootings for drastically harsher treatment than aiders and abettors in non-gang shootings," and further asserts that "[t]he statute also violates due process, by drastically increasing the punishment for aiders and abettors without any requirement that the jury find the aider and abettor knew or intended that the crime would be committed by the use or discharge of a firearm."

Rangel acknowledges that courts have rejected these arguments. Our district and division of the Court of Appeal is among them. (See *People v. Gonzales* (2001) 87 Cal.App.4th 1 (*Gonzales*).) We see no basis here to ignore our previous rulings, or to depart from the well-reasoned ruling issued by another division of our Court. (See *People v. Lujano* (2014) 229 Cal.App.4th 175, 190.)

In *Gonzales*, *supra*, 87 Cal.App.4th at p. 13, we concluded that an equal protection challenge to section 12022.53, subdivision (d) failed because aiders and abettors of gang members are not similarly situated to aiders and abettors who are not members of a criminal street gang. The former act with the additional purpose "of promoting and furthering their street gang in its criminal conduct." (*Ibid.*) Another division within our district also rejected the precise equal protection argument Rangel raises here. It concluded that there is a rational basis for the resultant disparity in punishment between gang and non-gang aiders and abettors because "the state has a legitimate interest in suppressing criminal street gangs" and "in punishing criminal gun use more severely than the use of other weapons." (*People v. Hernandez* (2005) 134 Cal.App.4th 474, 481

100

(*Hernandez*).)  As the court in *Hernandez* explained, "Courts have long recognized, however, a Legislature 'acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach.'  It may direct its attention '"to those classes of cases where the need is deemed to be clearest."'  In enacting the street gang legislation in 1988 the Legislature found, among other things, 'in Los Angeles County alone there were 328 gang-related murders in 1986, and that gang homicides in 1987 have increased 80 percent over 1986.'  When the Legislature enacted section 12022.53 ten years later and made aiders and abettors of gang crimes involving gun use equally liable with the actual perpetrator it did so 'in recognition of the serious threats posed to the citizens of California by gang members using firearms.'  As our Supreme Court has stated, the Legislature 'is not prohibited by the equal protection clause from striking the evil where it is felt the most.'" (*Hernandez*, *supra*, 134 Cal.App.4th at p. 482, footnotes omitted.)  We find this reasoning persuasive.  We likewise agree with the *Hernandez* court's conclusion – and reject Rangel's contention to the contrary– hat "[i]t is irrelevant to this [the achievement of the Legislature's] purpose whether the aider and abettor was a hard-core gang member or merely a 'wannabe.'" (*Hernandez*, *supra*, 134 Cal.App.4th at p. 483.)

In *Gonzales* we also rejected the underdeveloped due process argument Rangel raises here:  that section 12022.53, sections (d) and (e)(1) are unconstitutional because they do not require the jury to find that the aider and abettor knew or intended the target crime to be effectuated by the use or discharge of a firearm.  (See *Gonzales*, *supra*, 87 Cal.App.4th at p. 15.)  We noted that "'an aider and abettor can be subject to life imprisonment for willful, deliberate, and premeditated murder even if he or she did not personally deliberate or premeditate.' [Citation.]" (*Id.* at p. 14.)  The Supreme Court recently reiterated that principle in *People v. Chiu*, *supra*, 59 Cal.4th at 166-167.  The same is true in the context of the challenged enhancement: it need only be foreseeable, not necessarily known, to the aider and abettor that the principal may seek to accomplish the shared goal by using a firearm.  (See *People v. Garcia* (2002) 28 Cal.4th 1166, 1177 ["There is no dispute that an aider and abettor need not personally use or discharge a

101

firearm to be liable under section 12022.53."].) We accordingly reject Rangel's due process argument.

## DISPOSITION

The trial court is directed to correct Adame's and Rodriguez's abstracts of judgment as to counts 2 and 3 by ordering the enhancements on those counts stayed in accordance with its oral pronouncements. The clerk is directed to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.